1  Eric A. Buresh (*pro hac vice* to be filed)
   eburesh@shb.com
2  Michelle L. Marriott (*pro hac vice* to be filed)
   mlmarriott@shb.com
3  Paul Hart (*pro hac vice* to be filed)
   phart@shb.com
4  **SHOOK, HARDY & BACON, L.L.P.**
   2555 Grand Boulevard
5  Kansas City, MO 64108
   Telephone: (816) 474-6550
6  Facsimile: (816) 421-5547

7  Andrew L. Chang (SBN: 222309)
   achang@shb.com
8  **SHOOK, HARDY & BACON L.L.P.**
   One Montgomery, Suite 2700
9  San Francisco, California 94104-4505
   Telephone: (415) 544-1900
10 Facsimile: (415) 391-0281

11 Attorneys for Defendants
   UBISOFT ENTERTAINMENT
12 and UBISOFT, INC.

13                    UNITED STATES DISTRICT COURT

14              FOR THE NORTHERN DISTRICT OF CALIFORNIA

15

16 OG INTERNATIONAL LTD. and O-GAMES,      Case No. 11-cv-4980  DMR
   INC.,
17
                                           **UBISOFT'S MEMORANDUM OF POINTS**
18          Plaintiffs and Counter-        **AND AUTHORITIES IN SUPPORT OF**
            Defendants,                    **MOTION FOR TEMPORARY**
19                                         **RESTRAINING ORDER AND**
       v.                                  **PRELIMINARY INJUNCTION**
20
   UBISOFT ENTERTAINMENT and               **DEMAND FOR JURY TRIAL**
21 UBISOFT, INC.,
                                           **HEARING: To Be Scheduled**
22          Defendants and Counter-
            Plaintiffs.
23

24

25

26

27

28

FILED

OCT 1 2 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

## **TABLE OF CONTENTS**

I.   STATEMENT OF FACTS ...........................................................................................2

    A.   Ubisoft's Just Dance Series is Original, Visually Distinctive, Immediately
        Recognizable, and the Industry Leading Dance-Based Video Game. .................... 2

        1.   Ubisoft Releases Its First Just Dance Video Game in 2009. .......................3

        2.   Ubisoft's Second Release in the Series, Just Dance 2 Incorporates the
              Key Visual Elements of Just Dance To Increased Commercial Success.....4

        3.   Ubisoft Releases Just Dance 3 in the United States on October 11,
              2011............................................................................................................5

        4.   Ubisoft Has Copyrighted Its Protected Expression. ...................................7

    B.   OG Announces Release of Get Up and Dance, Which Copies the Most
        Prominent Aesthetic Elements from Ubisoft's Just Dance Series. ......................... 8

II.  ARGUMENT .............................................................................................................8

    A.   Ubisoft is Likely to Succeed on the Merits of its Copyright and Trade Dress
        Claims. ................................................................................................................ 9

        1.   Copyright Infringement. .............................................................................9

              a.   Ubisoft Owns Copyrights in Just Dance. ..........................................9

              b.   Get Up and Dance is an unauthorized copy of Ubisoft's
                    copyrighted Just Dance. ..................................................................10

                  i)   OG's Get Up and Dance is substantially similar to
                        Ubisoft's Just Dance in both ideas and expression............11

                  ii)  Extrinsic Inquiry: The "avatars" and "instructors"
                        developed by Ubisoft in Just Dance, and copied by OG
                        in Get Up and Dance, are protectable  and enjoy broad
                        protection. .......................................................................12

                  iii) Intrinsic Inquiry: A reasonable observer would consider
                        OG's Get Up and Dance video game to be substantially
                        similar to Ubisoft's protected Just Dance game. ...............14

        2.   Trade Dress Infringement. .......................................................................16

               a.   Ubisoft's trade dress is nonfunctional...........................................16

              b.   Ubisoft's trade dress is distinctive. ................................................17

c.    There is a strong likelihood that the public will confuse OG's Get Up and Dance as being part of the Just Dance series..............18

    i)    Get Up and Dance is nearly identical to Ubisoft's trade dress. ...............................................................................19

    ii)    Get Up and Dance will compete directly – and through the same marketing channels – as Just Dance. ..................19

    iii)    Ubisoft's trade dress is inherently distinctive....................20

    iv)    Actual confusion already exists. ........................................20

B.    Ubisoft Will Suffer Irreparable Harm without Injunctive Relief..........................20

C.    The Balance of Hardships Tips Decidedly in Ubisoft's Favor. ............................23

D.    The Public Interest is Served by Enjoining the Release of OG's Infringing Video Game. ........................................................................................................23

III.    CONCLUSION...........................................................................................................24

1

## TABLE OF AUTHORITIES

2

Page(s)

3   CASES

4   *AMF, Inc. v. Sleekcraft Boats,*
        599 F.2d 341 (9th Cir. 1979) ........................................................................18, 19
5

6   *Apple Computer v. Microsoft Corp.,*
        35 F.3d 1435 (9th Cir. 1994) ........................................................................10, 14

7   *Atari, Inc. v. North American Philips Consumer Electronics Corp.,*
8       672 F.2d 607 (7th Cir. 1982) ........................................................................11, 15

9   *Aurora World, Inc. v. TY Inc.,*
        719 F. Supp. 2d 1115 (C.D. Cal. 2009) ..............................................................19
10

11  *Autodesk, Inc. v. Dassault Systemes Solidworks Corp.,*
        685 F. Supp. 2d 1001 (N.D. Cal. 2009) ..............................................................17

12  *Brown Bag Software v. Symantec Corp.,*
13      960 F.2d 1465 (9th Cir. 1992) ..............................................................................14

14  *Brunswick Corp. v. British Seagull, Ltd.,*
        35 F.3d 1527 (Fed. Cir. 1994) . No .....................................................................16
15

16  *Caesars World, Inc. v. Milanian,*
        247 F. Supp. 2d 1171 (D. Nev. 2003) ..................................................................23

17  *Clicks Billiards, Inc. v. Sixshooters Inc.,*
18      251 F.3d 1252 (9th Cir. 2001) ..............................................................................18

19  *Data East USA, Inc. v. Epyx, Inc.,*
        862 F.2d 204 (9th Cir. 1988) ............................................................................9, 14
20

21  *Disc Golf Ass'n v. Champion Discs,*
        158 F.3d 1002 (9th Cir. 1998) ........................................................................16, 17

22  *Dream Games of Ariz., Inc. v. PC Onsite,*
23      561 F.3d 983 (9th Cir. Ariz. 2009) .........................................................................9

24  *Dreamwerks Prod. Group v. SKG Studio,*
        142 F.3d 1127 (9th Cir. 1998) ..............................................................................18
25

26  *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC,*
        741 F. Supp. 2d 1165 (C.D. Cal. 2010) .....................................................16, 17, 19

27  *Flag Fables, Inc. v. Jean Ann's Country Flags & Crafts, Inc.,*
28      730 F. Supp. 1165 (D. Mass. 1989) ......................................................................22

*Flexible Lifeline Sys. v. Precision Lift, Inc.,*
  2011 U.S. App. LEXIS 17462 (9th Cir. Mont. Aug. 22, 2011)...............................................22

*International Jensen, Inc. v. Metrosound U.S.A., Inc.,*
  4 F.3d 819 (9th Cir. 1993) ...................................................................................16, 17

*Interstellar Starship Servs. v. Epix, Inc.,*
  184 F.3d 1107 (9th Cir. 1999) .........................................................................................18

*Mattel, Inc. v. MGA Entm't, Inc.,*
  616 F.3d 904 (9th Cir. 2010) ...............................................................................10, 12, 14

*Mint, Inc. v. Iddi Amad,*
  2011 U.S. Dist. LEXIS 49813 (S.D.N.Y. May 9, 2011) ......................................................22

*Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.,*
  856 F.2d 1445 (9th Cir. 1988) .........................................................................................19

*N.Y. Times Co. v. Tasini,*
  533 U.S. 483 (2001).............................................................................................................9

*Narell v. Freeman,*
  872 F.2d 907 (9th Cir. 1989) .........................................................................................10

*Network Automation, Inc. v. Advanced Sys. Concepts,*
  638 F.3d 1137 (9th Cir. 2011) ...........................................................................................9

*Paddington Corp. v. Attiki Importers & Distribs., Inc.,*
  996 F.2d 577 (2d Cir. 1993)...............................................................................................20

*Perfumebay.com, Inc. v. eBay Inc.,*
  506 F.3d 1165 (9th Cir. 2007) .........................................................................................18

*Qualitex Co. v. Jacobson Products Co.,*
  514 U.S. 159 (1995)............................................................................................................16

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,*
  240 F.3d 832 (9th Cir. 2001) .....................................................................................9, 22

*Swirsky v. Carey,*
  376 F.3d 841 (9th Cir. 2004) .........................................................................................10

*Three Boys Music Corp. v. Bolton,*
  212 F.3d 477 (9th Cir. 2000) .........................................................................................10

*TrafFix Devices, Inc. v. Marketing Displays, Inc.,*
  532 U.S. 23 (2001.)............................................................................................................16

*Warner Bros. Entm't, Inc. v. WTV Sys.*,
  2011 U.S. Dist. LEXIS 107772 (C.D. Cal. Aug. 1, 2011).........................................................23

STATUTES

15 U.S.C. 1116(a) ...................................................................................................................8

15 U.S.C. § 1125(a) ...............................................................................................................16

15 U.S.C. § 1125(a) ...............................................................................................................16

17 U.S.C. § 101 .......................................................................................................................9

17 U.S.C. § 106 .......................................................................................................................9

17 U.S.C. § 501(a) ..................................................................................................................9

17 U.S.C. § 502(a) ..................................................................................................................8

218944 V1

**UBISOFT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION**

Ubisoft Entertainment, S.A. and Ubisoft, Inc. (collectively, "Ubisoft") by this motion respectfully ask this Court to prevent an irreparable harm before it occurs. Ubisoft has created and continues to create the most successful and popular dance-based video game franchise on the market today – the *Just Dance* series (*Just Dance*, *Just Dance 2*, and the recently released *Just Dance 3*). Ubisoft created at least two key visual elements that distinguish the *Just Dance* series from other dance-based video games on the market – the avatar (left) and instructor (right) elements:



These elements establish a recognizable brand consistency throughout the *Just Dance* series.

OG International and O-Games USA (collectively, "OG") have announced and are preparing to release a competing dance-based video game—*Get Up and Dance*. *Get Up and Dance*, in violation of Ubisoft's copyrights and trade dress, unfairly competes by copying in nearly identical expression key visual elements from *Just Dance*:



MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
11-CV-4980

1

1 If the Court does not enjoin the release of *Get Up and Dance*, Ubisoft will be unnecessarily and

2 irreparably harmed. OG could have and most definitely should have prevented such harm by simply

3 not copying the unique visual expression of *Just Dance*. Many dance-based games have gone before

4 and each creatively and uniquely expressed the same elements. Yet OG decided to copy the most

5 popular game on the market. To make matters worse, OG intends to release their illegal game into

6 the exact same market, at nearly the same time as Ubisoft's new *Just Dance* 3, but, of course, at a

7 lower price point.

8   There is no better time to stop a harm than before it occurs. This is particularly true where

9 there is simply no way to return the harmed party to the status quo. Such is the case here. The video

10 game market is, like many markets, popularity driven. Once a game or franchise of games develops

11 a degree of popularity, sales take off. Successful franchises, like the *Just Dance* series, drive sales

12 through loyalty, name recognition, and goodwill. Further, like books, bestseller lists drive game

13 sales. Once a game moves onto and up bestseller lists, sales take off. OG is clearly seeking to

14 benefit from the *Just Dance* franchise's popularity and, if not prevented, OG's release of *Get Up and*

15 *Dance* will irreparably damage the strength of the *Just Dance* franchise. Regardless of whether

16 consumers are confused and believe that *Get Up and Dance* actually *is* a *Just Dance* game, or

17 believe it is a less expensive **imitation** of a *Just Dance* game, Ubisoft's *Just Dance* franchise will be

18 damaged if *Get Up and Dance* is released. Every lost sale impacts the perceived popularity of the

19 *Just Dance* franchise, and has significant upstream and downstream impacts on the entire *Just Dance*

20 series. There is simply no way to track or calculate this harm. Absent an injunction, *Get Up and*

21 *Dance* could be, as one online review put it, "the knife in the [*Just Dance*] franchise before it even

22 shows its face." http://7bitarcade.com/feature-post/get-up-and-dance-preview/. The Court should

23 enjoin the release of *Get Up and Dance* in the United States, and prevent Ubisoft from suffering

24 irreparable and irreversible harm.

25 **I. STATEMENT OF FACTS**

   **A. Ubisoft's *Just Dance* Series is Original, Visually Distinctive, Immediately**

26    **Recognizable, and the Industry Leading Dance-Based Video Game.**

27   Ubisoft is a leading international video game developer, publisher, and distributor. Ex. A

28 MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION

                               11-CV-4980

(Ubisoft Website, *At A Glance*).[1]  Formed in 1986, Ubisoft has become a leader in the entertainment industry – it now boasts the second-largest in-house video game development staff in the world, and is the third-largest independent video game publisher in the United States. *Id.*  Ubisoft's portfolio is filled with heralded video game franchises such as the *Tom Clancy* series, the *Assassin's Creed* series, and the *Just Dance* series. Ex. B (Ubisoft Website, *History*).  Ubisoft credits its success to strong game franchises, and today has a portfolio of 20 multimillion unit-selling franchises that represent approximately two-thirds of its annual sales. Ex. C (Ubisoft Website, *Strategy*).

### 1. Ubisoft Releases Its First *Just Dance* Video Game in 2009.

In November 2009, Ubisoft released the first game in its *Just Dance* series of dance video games. Ex. D (Declaration of Laurent Detoc ("Detoc Dec.") ¶ 2).  *Just Dance* was released on the Nintendo Wii platform.  *Just Dance* instructs players to physically perform dance routines, and tracks the player's movements.  Ex. E (Ubisoft Website, *Just Dance*).  *Just Dance* achieved commercial success, selling over two million copies worldwide. Ex. D (Detoc Dec. ¶ 3).  At the time it was released, *Just Dance* was the fastest-selling new third-party game for the Nintendo Wii. (*Id.* ¶ 3).

*Just Dance* was not the first video game in the dance genre, but it was aesthetically original and distinctive from other prior games in the genre.  (*Id.* ¶ 2).  Although virtually all dance games have a central dancing figure, or "avatar," the avatars in *Just Dance* were distinct partially silhouetted stylized dancers with white skin and bright clothing:

---

[1] The exhibits referred to throughout this memorandum refer to the exhibits to the Declaration of Andrew Chang.

  

Ex. D (Detoc Dec. ¶ 2); Ex. F (*Just Dance* Screenshots).  In addition, Ubisoft developed unique, original, and immediately-identifiable "instructors" to relay the *Just Dance* moves to the player:



Ex. D (Detoc Dec. ¶ 2); Ex. F (*Just Dance* Screenshots).

> ## 2. Ubisoft's Second Release in the Series, *Just Dance 2* Incorporates the Key Visual Elements of *Just Dance* To Increased Commercial Success.

Following on the success of *Just Dance*, Ubisoft released its second title in the franchise, *Just Dance 2*, in the United States on October 12, 2010.  Ex. D (Detoc Dec. ¶ 4).  *Just Dance 2* also was released for the Wii platform.  *Id.*  To maintain consistency in the series and the brand identity, *Just Dance 2* utilized the same distinctive visual elements as in *Just Dance*.  *Id.*  In particular, *Just Dance 2* incorporated the distinct partially silhouetted dancers with white skin and bright clothing that had become immediately-recognizable with the *Just Dance* series:



Ex. D (Detoc Dec. ¶ 4); Ex. G (*Just Dance 2* Screenshots). *Just Dance* 2 also incorporated the uniquely-identifiable "instructors" that were first seen in *Just Dance*:



Ex. D (Detoc Dec. ¶ 4); Ex. G (*Just Dance 2* Screenshots).

The commercial success of *Just Dance* 2 surpassed the success of *Just Dance*. Ex. D (Detoc Dec. ¶ 5). Less than three months' after its release, Ubisoft sold over 5 million copies of *Just Dance 2*. *Id.* By July 2011, *Just Dance 2* had become the highest-selling third-party game for the Wii platform of all time. Ex. D (Detoc Dec. ¶ 5); Ex. H (Just Dance 2 Highest Selling Third Party Title on Wii). Of the success of *Just Dance 2*, Ubisoft's Executive Director for North America, Laurent Detoc, commented:

> "Ubisoft is incredibly proud of the monumental success *Just Dance 2* has had the past nine months. The game's outstanding performance solidifies the *Just Dance* brand as a pop culture phenomenon."

Ex. H (Just Dance 2 Highest Selling Third Party Title on Wii). To date, Ubisoft has sold over 16 million copies of games in the *Just Dance* series. Ex. D (Detoc Dec. ¶ 6).

**3.     Ubisoft Releases *Just Dance 3* in the United States on October 11, 2011.**

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
11-CV-4980

5

1   On October 7, 2011, Ubisoft released *Just Dance 3* in the United States. Ex. D (Detoc Dec. ¶

2   7). *Just Dance 3* was released on the Nintendo Wii, as well as Microsoft Xbox 360 platform. *Id.* It

3   will be released on the Sony Playstation 3 platform later this year. *Id.*

4   Like its predecessors, *Just Dance 3* incorporates the distinctly-styled avatars (partially

5   silhouetted dancers with white skin and bright clothing):



16   Ex. D (Detoc Dec. ¶ 8); Ex. I (*Just Dance 3* Screenshots). *Just Dance 3* also carries through the

17   uniquely-identifiable "instructors" that were key brand identifiers in both *Just Dance* and *Just Dance*

18   *2*:



23   Ex. D (Detoc Dec. ¶ 8); Ex. I (*Just Dance 3* Screenshots). The distinctive expression of the avatar

24   and instructor elements critically define the unique look of the *Just Dance* series. Ex. D (Detoc Dec.

25   ¶ 9). Ubisoft incorporates these unique elements in the *Just Dance* games and on the packaging for

26   the *Just Dance* games. *Id.* For example, Ubisoft has included screen shots depicting the avatar and

28   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
11-CV-4980

instructor elements on the back cover of each *Just Dance* game, and the distinctive avatars are prominently featured on the cover of the *Just Dance 2* and *Just Dance 3*:



Ex. D (Detoc Dec. ¶ 9); Ex. J (Amazon Best Sellers List for October 7, 2011; Wal-Mart Best Sellers List for October 7, 2011). By designing the games in the *Just Dance* series to look and feel substantially the same, consumers are able to identify a particular game as belonging to the *Just Dance* series based on the unique aesthetics of the game. Ex. D (Detoc Dec. ¶ 9).

Ubisoft expects that *Just Dance 3* will further develop the *Just Dance* brand identity, and increase the popularity of Ubisoft's franchise in the dance genre of video games. (*Id.* ¶ 8). In the weeks leading up to its release, *Just Dance* 3's pre-release sales numbers alone made it the second most popular Wii video game. Ex. J (Amazon Best Sellers List for October 7, 2011; Wal-Mart Best Sellers List for October 7, 2011). In addition, Ubisoft's older *Just Dance* titles – the original *Just Dance* and *Just Dance* 2 – have resurged in parallel into the top 15 best selling Wii games. Ex. J (Wal-Mart Best Sellers List for October 7, 2011). Each of these games is currently offered at $39.99. *Id.*

### 4. Ubisoft Has Copyrighted Its Protected Expression.

Ubisoft owns copyrights in the original and creative visual expression in the *Just Dance* video games. Ubisoft Entertainment filed copyright registration applications for both *Just Dance* and *Just Dance 2* with the Copyright Office on July 11, 2011. Ex. K (Copyright Registrations); Ex. D (Detoc Dec. ¶ 10).

**B.     OG Announces Release of *Get Up and Dance,* Which Copies the Most Prominent Aesthetic Elements from Ubisoft's *Just Dance* Series.**

Established in 2004, Defendant OG International is a relatively new video game publisher based in the United Kingdom. Ex. L (OG International Website, Corporate). Defendant O-Games is OG International's wholly-owned subsidiary in North America. *Id.* OG International and O-Games developed and plan to release their first entry in the dance genre of video games, *Get Up and Dance,* in the United States on November 1, 2011. Ex. M (GameStop Pre-Release Order). *Get Up and Dance* will be released on both the Nintendo Wii and Sony Playstation 3 video game platforms. Defendant Crave Entertainment will distribute *Get Up and Dance* in the United States. *Id.*

Rather than develop original avatars and instructors, OG chose to mimic the recognizable aesthetics of Ubisoft's commercially-proven *Just Dance* franchise. Like Ubisoft's avatars, OG replicated the *Just Dance* avatars' partially silhouetted stylized dancers with white skin and bright clothing, and similarly copied the instructors used in *Just Dance,* as is shown below:



Ex. N (*Get Up and Dance* Screenshots); *see also* Ex. F (*Just Dance* Screenshots); Ex. G (*Just Dance 2* Screenshots); Ex. I (*Just Dance 3* Screenshots). *Get Up and Dance* is being marketed through many of the same commercial channels as Ubisoft's *Just Dance,* such as GameStop and Wal-Mart. Ex. M (GameStop Pre-Release Order; Wal-Mart Pre-Release Order). *Get Up and Dance* will be offered for $29.99 in the United States. *Id.*

## II.     ARGUMENT

The Copyright Act expressly grants the Court authority to "grant temporary and final injunctions on such terms as it may deem reasonable to *prevent* or restrain infringement of a

1  copyright." 17 U.S.C. § 502(a) (emphasis added). The discretion to enjoin trade dress infringement
2  is similarly within the Court's authority. 15 U.S.C. 1116(a). The Court applies a "four factor test"
3  when considering whether to grant a preliminary injunction: the movant "must establish that he is
4  likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of
5  preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public
6  interest." *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1144 (9th Cir. 2011)
7  (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)). The standards for a temporary restraining
8  order and a preliminary injunction are the same. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush &*
9  *Co., Inc.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001).

10  **A.   Ubisoft is Likely to Succeed on the Merits of its Copyright and Trade Dress Claims.**

11  **1.   Copyright Infringement.**

12  OG's *Get Up and Dance* video game infringes Ubisoft's copyrights. Ubisoft owns the
13  copyrights on its *Just Dance* games, and *Get Up and Dance* is an unauthorized copy of Ubisoft's
14  protected expression. *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 206 (9th Cir. 1988)
15  (copyright infringement requires showing that (1) movant owns copyrights and (2) respondent has
16  created an unauthorized copy). "Anyone who violates any of the exclusive rights of the copyright
17  owner as provided by section[ ] 106 . . . is an infringer of the copyright." 17 U.S.C. § 501(a).

18  **a.   Ubisoft Owns Copyrights in Just Dance.**

19  Ubisoft holds a bundle of ***exclusive*** rights, including the right to reproduce and to distribute
20  the *Just Dance* games to the public. *See N.Y. Times Co. v. Tasini*, 533 U.S. 483, 495 (2001); 17
21  U.S.C. § 106. Ubisoft's employees created an original work of authorship in the *Just Dance* series
22  of video games, vesting in Ubisoft ownership of copyrights in the games. *See* 17 U.S.C. § 101 (a
23  "work made for hire" is copyrighted when "prepared by an employee within the scope of his or her
24  employment"); *id.* at § 201(b) (ownership of copyright vests automatically in the employer of an
25  author if it was a "work made for hire"). Ubisoft registered its copyrights in *Just Dance* and *Just*
26  *Dance 2* with the Copyright Office on July 11, 2011. Ex. K (Copyright Registrations). Upon
27  issuance, Ubisoft's "certificate of registration raises the presumption of copyright validity and

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
11-CV-4980

1    ownership." *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 987 n. 2 (9th Cir. Ariz. 2009).

2         **b.    Get Up and Dance is an unauthorized copy of Ubisoft's**
3              **copyrighted Just Dance.**

4         *Get Up and Dance* is an illegal copy of Ubisoft's protected expression. *Get Up and Dance*

5    copies the key original creative aspects of Ubisoft's *Just Dance* series of video games – the avatars

6    expressed as partially silhouetted dancers with white skin and bright clothing, and the instructors.

7    Proof of copying requires a showing (1) that OG had access to the protected work before creating the

8    accused work and (2) that a substantial similarity of expression exists between the protected and

9    accused works. *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989).

10        OG plainly had access to Ubisoft's previous *Just Dance* titles.  Access exists when the

11   copyrighted work as been "widely distributed."  The *Just Dance* series has been publicly and

12   commercially available in the United States since November 2009. Ex. D (Detoc Dec. ¶ 2); *Three*

13   *Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000) (access is proven "where the

14   plaintiff's work has been widely distributed").  Because *Just Dance* is commercially available,

15   providing OG with unfettered access, Ubisoft is entitled to a lower standard of proof on the question

16   of substantial similarity. *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004).

17        Even without the lower standard of proof to which Ubisoft is entitled, OG's *Get Up and*

18   *Dance* is substantially similar to Ubisoft's protected expression in the *Just Dance* series of video

19   games.  The Ninth Circuit applies a two-part test to assess substantial similarity. *Apple Computer v.*

20   *Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994).  First, an "extrinsic" inquiry "objectively

21   considers whether there are substantial similarities in both ideas and expression."  *Id.*  Under this

22   extrinsic inquiry, analytic dissection may be employed to determine "whether similar elements

23   [between the works] are protectable . . ." *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 913 (9th

24   Cir. 2010).  After identifying the protectable elements, the court determines the breadth of protection

25   due – whether the similar elements in the protected work enjoy broad protection and need only be

26   substantially similar to the accused work, or whether the protection should be limited and protect

27   only against virtually-identical copying. *Id.* at 914.  The second step is an "intrinsic" inquiry that

28   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
     11-CV-4980

1    asks "whether an ordinary reasonable observer would consider the copyrighted and challenged

2    works substantially similar (or virtually identical)." *Id.*

3                    i)       **OG's *Get Up and Dance* is substantially similar to Ubisoft's**
                              ***Just Dance* in both ideas and expression**
4

5          Before applying the extrinsic and intrinsic analyses, it is important to note the difference

6    between ideas and expression and note that OG's *Get Up and Dance* copies both.  Ubisoft's *Just*

7    *Dance* and Defendant's *Get Up and Dance* are largely identical in underlying ideas – they are both

8    dance video games, in which the game instructs the player to perform dance moves, the player's

9    movements are captured by the gaming system, the dance routine is "performed" by an "avatar," and

10   points are awarded for the degree to which a player conforms to the dance.

11         More importantly, the ***expression*** of key elements in Ubisoft's *Just Dance* series – the

12   prominent "avatar" and "instructor" elements – is copied nearly identically in *Get Up and Dance*.

13   While it is true that most dance video games feature a central avatar and instruct the player regarding

14   dance moves, Ubisoft's unique and original ***expression*** of the avatar and instructor is afforded broad

15   copyright protection.  The pinnacle example of this concept is provided in a similar video game

16   copyright case involving PAC-MAN, *Atari, Inc. v. North American Philips Consumer Electronics*

17   *Corp.*, 672 F.2d 607 (7th Cir. 1982).  In *Atari*, the court preliminarily enjoined a video game that

18   copied PAC-MAN.  *Atari*, 672 F.2d at 619-20.  The court explained that although many concepts in

19   the infringing game – such as a maze, scoring table, tunnel exits, and the use of dots to accumulate

20   points – were "standard" game devices and only protected from identical copying, the ***unique***

21   ***expressions*** of PAC-MAN like the now-famous "gobbler" pursuing "ghost monsters" were entitled

22   to broad copyright protection.  *Id.* at 616-17.  Other games in the maze-chase genre employed

23   entirely different means of expressing these characters, making the gobbler and ghost monsters

24   unique expressions of the idea.  *Id.* at 617-18.  Because the gobbler and ghost monsters in the

25   accused work were substantially similar to those in PAC-MAN, the court found substantial similarity

26   despite many differences in non-protected aspects of the games.  *Id.* at 619-20.

27         The principles established in *Atari* apply directly here.  Competing video games in the dance

28   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
                                                                                        11-CV-4980

1    genre (other than *Get Up and Dance*) have utilized numerous different ways to express the "avatar"

2    and "instructor" elements common to dance video games, as is described in detail below. Ubisoft

3    expressed these key features in an original and unique way, and that expression is entitled to broad

4    protection. Further, because OG copied these prominent elements nearly identically in *Get Up and*

5    *Dance*, it is substantially similar to Ubisoft's protected work.

6            **ii)**      **Extrinsic Inquiry: The "avatars" and "instructors"**
                             **developed by Ubisoft in *Just Dance*, and copied by OG in**

7                              ***Get Up and Dance*, are protectable and enjoy broad**
                             **protection.**

8

9       The extrinsic inquiry requires analytic dissection to determine "whether similar elements

10    [between the works] are protectable or unprotectable." *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d

11    904, 913 (9th Cir. 2010). After identifying the protectable elements, the court determines the

12    breadth of protection due. *Id.* at 914. The extrinsic inquiry compares similar elements between the

13    works. As is shown below, OG's infringing *Get Up and Dance* uses avatars and instructors that are

14    nearly identical to Ubisoft's avatars and instructors in *Just Dance*:



23    Ex. N (*Get Up and Dance* Screenshots); *see also* Ex. F (*Just Dance* Screenshots); Ex. G (*Just Dance*

24    *2* Screenshots); Ex. I (*Just Dance 3* Screenshots). These elements are protectable – where there is a

25    wide range of expression for a given idea, copyright protection is broad and infringement will be

26    found if the works are "substantially similar." *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 913-

27    914 (9th Cir. 2010). Like the "gobbler" and "ghost monsters" in PAC-MAN which represented just

28    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
                                                               11-CV-4980

1   one of countless ways to express maze-chase characters, Ubisoft's avatars and instructors are just

2   one of countless ways to express these elements in the dance-based video game genre.  For example,

3   the avatars utilized to date in competing video games in the dance genre are substantially different

4   than those created for *Just Dance*.  As is demonstrated in the examples below, the avatars of

5   competing games are quite different than those in *Just Dance*, demonstrating the broad range of

6   expression available for the avatar:

| **Dancing with the Stars** **by Activision:** | **Boogie Superstar** by EA: | **Dance Dance Revolution:** **Hottest Party by Bemani** |
|---|---|---|
|  | | |
| **Avatars from Ubisoft's *Just Dance* series of video games** | | |
|  |  |  |

24   Ex. O (Competing Game Screenshots); *see also* Ex. F (*Just Dance* Screenshots); Ex. G (*Just Dance*

25   *2* Screenshots); Ex. I (*Just Dance 3* Screenshots).

26       The same is true for the "instructor" element -- many different expressions for the instructor

27   element have been employed in competing dance-based video games:

28   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
11-CV-4980

| Dancing with the Stars by Activision: | Boogie Superstar by EA: | Dance Dance Revolution: Hottest Party by Bemani |
|---|---|---|
| | | |



**Instructors from Ubisoft's *Just Dance* series of video games**

Ex. O (Competing Game Screenshots); *see also* Ex. F (*Just Dance* Screenshots); Ex. G (*Just Dance 2* Screenshots); Ex. I (*Just Dance 3* Screenshots).

As unique expressions among countless options, Ubisoft's avatars and instructors are both protectable and afforded broad copyright protection. Accordingly, OG's use of Ubisoft's protected expression of both the avatar and instructors in *Get Up and Dance* is analyzed under the substantial similarity test. *Apple Computer v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994).

           **iii)**    **Intrinsic Inquiry: A reasonable observer would consider OG's *Get Up and Dance* video game to be substantially similar to Ubisoft's protected *Just Dance* game.**

The "intrinsic" inquiry next asks "whether an ordinary reasonable observer would consider the copyrighted and challenged works substantially similar (or virtually identical)." *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 914 (9th Cir. 2010). In applying the intrinsic test, the focus remains on the key protectable elements – here, the avatars and instructors. *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1476 (9th Cir. 1992) (intrinsic component "involves a subjective

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
11-CV-4980

1  analysis of similarities in expression"); *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 208 (9th

2  Cir. Cal. 1988) (finding of infringement may not be defeated by analyzing dissimilarities).

3      *Get Up and Dance* is substantially similar to *Just Dance*.  Both works include avatars that are

4  partially silhouetted stylized dancers with white skin and bright clothing; and both works use nearly-

5  identical instructors:



22  Ex. F (*Just Dance* Screenshots); Ex. G (*Just Dance 2* Screenshots); Ex. I (*Just Dance 3*

23  Screenshots); Ex. N (*Get Up and Dance* Screenshots). OG's selection of these elements to copy is

24  strategic.   The avatars occupy "center stage" and are the single most dominant visual element in

25  each game.  The instructors are similarly important because players must watch the instructors

26  closely in order to perform the correct dance move during game play.  More so than any other

27  features in the video game genre, the avatars and instructors drive the look and feel of the games.

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
11-CV-4980

1   While there were countless ways OG could have depicted these core elements that were not

2   substantially similar to the protectable expression in *Just Dance*, OG opted to use Ubisoft's

3   expression. In the same way the infringer in *Atari* prevented from taking the visual expression of the

4   "gobbler," OG here should not be allowed to use a substantially similar avatar and instructor. In

5   sum, Ubisoft has demonstrated it is likely to succeed on its copyright infringement claim.

6
### 2.   Trade Dress Infringement.
7

8   Ubisoft is also likely to succeed on its 15 U.S.C. § 1125(a) trade dress infringement claim.

9   Trade dress "refers to the 'total image of a product' and may include features such as size, shape,

10   color, color combinations, texture or graphics." *International Jensen, Inc. v. Metrosound U.S.A.,*

11   *Inc.*, 4 F.3d 819, 822 (9th Cir. 1993). "A seller's adoption of a trademark or trade dress that is

12   confusingly similar to a competitor's constitutes unfair competition and is actionable under section

13   43(a) of the Lanham Act, 15 U.S.C. § 1125(a)." *Id.* A plaintiff may recover for trade dress

14   infringement if the trade dress is both nonfunctional and distinctive, and if there is a likelihood that

15   the public would confuse the alleged infringer's trade dress with that of the plaintiff. *Id.* at 823.

16   Ubisoft's avatars and instructors in its *Just Dance* series meet this test.

17
### a.   Ubisoft's trade dress is nonfunctional.

18   Ubisoft's trade dress is nonfunctional – the expression of the avatars and instructors in the

19   *Just Dance* series is not "essential to the use or purpose of the [games]." *TrafFix Devices, Inc. v.*

20   *Marketing Displays, Inc.*, 532 U.S. 23, 32 (2001.). Rather, the expression of these elements are

21   visually and aesthetically distinctive, and serve to identify the games as part of the *Just Dance*

22   franchise.   Importantly, competitors are not placed at a "significant non-reputation-related

23   disadvantage" by using avatars and instructors aesthetically distinct from Ubisoft's. *Id.* The Ninth

24   Circuit considers four factors to assess functionality: "(1) whether the design yields a utilitarian

25   advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian

26   advantages of the design, and (4) whether the particular design results from a comparatively simple

27   or inexpensive method of manufacture." *Disc Golf Ass'n v. Champion Discs*, 158 F.3d 1002, 1006

28   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
11-CV-4980

1   (9th Cir. 1998).  Here, all four factors weigh in favor of finding Ubisoft's trade dress nonfunctional.

2   Trade dress based on aesthetic elements provides utilitarian advantage only in "limited

3   circumstances . . . where the consumer is driven to purchase the product based on how it looks." *Fiji*

4   *Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1173 (C.D. Cal. 2010); *see*

5   *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 166 (1995) (use of a particular color on dry

6   cleaning pads might avoid noticeable stains and is thus aesthetically functional); *Brunswick Corp. v.*

7   *British Seagull, Ltd.*, 35 F.3d 1527, 1532 (Fed. Cir. 1994) (painting a product black served a

8   functional purpose by decreasing the apparent size of the object).  No utilitarian advantage is gained

9   through Ubisoft's artistic choice (first factor) and Ubisoft does not emphasize or tout any such

10  advantage (third factor).  The particular expression of Ubisoft's avatars and instructors serve no

11  purpose beyond identifying the games as part of the *Just Dance* franchise.  In fact, as to the second

12  element – whether alternative designs are available – it is important that competing dance-genre

13  video games utilize alternative expressions for their avatars and instructors.  These competing games

14  are not placed at any significant non-reputation based disadvantage by using aesthetically distinct

15  avatars and instructors.  Finally, the technology used to create these visual elements should differ

16  little in expense from many alternatives currently on the market.

17  **b.    Ubisoft's trade dress is distinctive.**

18  "A mark or dress is distinctive when it identifies the particular source of the product or

19  distinguishes it from other products." *International Jensen*, 4 F.3d at 824; *Autodesk, Inc. v. Dassault*

20  *Systemes Solidworks Corp.*, 685 F. Supp. 2d 1001, 1013 (N.D. Cal. 2009).  This can be shown either

21  by demonstrating that the trade dress is inherently distinctive or has acquired a secondary meaning

22  (as to product origin) with consumers in the marketplace.  *Disc Golf Ass'n v. Champion Discs*, 158

23  F.3d 1002, 1005 (9th Cir. 1998).  Inherent distinctiveness exists where the trade dress is so "unique,

24  unusual, or unexpected in this market that one can assume without proof that it will automatically be

25  perceived by consumers as an indicator of origin." *Fiji Water Co., LLC v. Fiji Mineral Water USA,*

26  *LLC*, 741 F. Supp. 2d 1165, 1176 (C.D. Cal. 2010) (citing *Seabrook Foods, Inc. v. Bar-Well Foods*

27  *Ltd.*, 568 F.2d 1342 (CPPA 1977)).  Courts may consider the following relevant factors to assess the

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
    11-CV-4980

inherent distinctiveness of Ubisoft's trade dress: (1) whether the design is a common, basic shape or design and (2) whether it was unique or unusual in a particular field. *Id.* Ubisoft's trade dress is inherently distinctive because its original, unique and immediately identifiable avatars and instructors distinguish *Just Dance* from competing dance video game products.

Ubisoft incorporates these unique elements both in the *Just Dance* games themselves and on the packaging. For example, Ubisoft has included screen shots depicting the avatar and instructor elements on the back cover of each *Just Dance* game, and the distinctive avatars are prominently featured on the cover of *Just Dance 3.* Ex. D (Detoc Dec. ¶ 9); Ex. P (*Just Dance 3* from Wal-Mart; *Just Dance 3* from Game Stop). In *every* version of the *Just Dance* series, the appearance of the avatars and instructors remains consistent. Ex. D (Detoc Dec. ¶¶ 2, 4, 8, 9). From the first release in the *Just Dance* series to the present, the visual impression of the avatars and instructors have continued to identify Ubisoft's games as members of the *Just Dance* series, and serve to distinguish these games from the competition.

**c.   There is a strong likelihood that the public will confuse OG's Get Up and Dance as being part of the Just Dance series.**

"Likelihood of confusion exists when customers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1265 (9th Cir. 2001) (quoting *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 845 (9th Cir. 1987)). Courts may consider the following "*Sleekcraft* factors" to assess likelihood of confusion:  (1) similarity of the conflicting designations; (2) relatedness or proximity of the two companies' products or services; (3) strength of trade dress; (4) marketing channels used; (5) degree of care likely to be exercised by purchasers in selecting goods; (6) OG's intent in selecting its designation; (7) evidence of actual confusion; and (8) likelihood of expansion in product lines. *Interstellar Starship Servs. v. Epix, Inc.*, 184 F.3d 1107, 1110 (9th Cir. 1999). These factors need not be rigidly weighed—some factors may be pivotal while others should be afforded little weight. *Dreamwerks Prod. Group v. SKG Studio*, 142 F.3d 1127, 1129-31 (9th Cir. 1998).   Here, the factors

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
11-CV-4980

1    overwhelmingly support a finding that there is a strong likelihood that the public will confuse OG's

2    *Get Up and Dance* as being part of Ubisoft's *Just Dance* series.  In fact, forums advertising the

3    release of *Get Up and Dance* already show ***actual confusion*** among consumers.

4    i)     **_Get Up and Dance_ is nearly identical to Ubisoft's trade dress.**

5        The level of similarity between Ubisoft's trade dress and OG's product is a key factor in the

6    likelihood of confusion analysis.  *Perfumebay.com, Inc. v. eBay Inc.*, 506 F.3d 1165, 1174 (9th Cir.

7    2007).  As is demonstrated above, *Get Up and Dance* has copied the distinctive avatar and instructor

8    elements that that are common to Ubisoft's *Just Dance* series and are included on all *Just Dance*

9    packaging.  OG copied these visual elements nearly identically in its product.  Factor one – the

10   similarity of the conflicting designations – weighs strongly in Ubisoft's favor.

11   ii)     **_Get Up and Dance_ will compete directly – and through the same marketing channels – as _Just Dance_.**

12       In factors 2, 4, and 8 listed above, the important inquiry is whether the goods are in direct

13   competition.  With respect to factor 2 – relatedness or proximity of the two competing companies'

14   products or services – courts examine whether the goods "are similar in use and function" and

15   "would be reasonably thought by the buying public to come from the same source if sold under the

16   same mark." *Aurora World, Inc. v. TY Inc.*, 719 F. Supp. 2d 1115, 1160 (C.D. Cal. 2009) (quoting

17   *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 n. 10, 350 (9th Cir. 1979)).  Here, *Just Dance* and

18   *Get Up and Dance* are so similar in use and function that they are practically interchangeable – they

19   are both video games in the dance genre.  As a consequence, they could be reasonably thought by the

20   buying public to come from the same source.

21       Related factor 4 – marketing channels used – "requires the court to consider whether the

22   predominant purchasers of the parties' goods are similar or different, and whether the marketing

23   approaches used resemble each other." *Id.* at 1162.  Upon its planned release, OG's *Get Up and*

24   *Dance* will directly compete with Ubisoft's *Just Dance* series and will be marketed through the same

25   channels.  Ex. M (GameStop Pre-Release Order; Wal-Mart Pre-Release Order).  Already, both

26   games are available for order or for pre-order from shared major retailers.  *Id.*

27       Finally, factor 8 – likelihood of expansion in product line – asks whether either party will

28   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
     11-CV-4980

1  expand use of the trade dress to directly compete. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 354

2  (9th Cir. 1979).  Because *Get Up and Dance* will directly compete if released, the Court need not

3  wait for an expansion to find a likelihood of confusion. Factors (2), (4), and (8) favor Ubisoft.

4  iii)     **Ubisoft's trade dress is inherently distinctive.**

5  Factor three – strength of trade dress – "rests on its distinctiveness." *Miss World (UK) Ltd. v.*

6  *Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1448 (9th Cir. 1988).  Ubisoft created original, unique

7  and immediately identifiable avatars and instructors.  Their look is unique among competitors that

8  they will "automatically be perceived by consumers as an indicator of origin" and are thus inherently

9  distinctive. *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1176 (C.D.

10 Cal. 2010).  Because inherent distinctiveness is indicative of a strong mark, this factor weighs in

11 Ubisoft's favor.  *See Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 585 (2d

12 Cir. 1993) (inherently distinctive trade dress is necessarily strong).

13 iv)     **Actual confusion already exists.**

14 With respect to factor 7 – evidence of actual confusion – although *Get Up and Dance* has not

15 been released yet, previews and pre-release reviews of the game already have generated some

16 evidence of actual consumer confusion.  First, commenting on a preview video of the accused

17 product posted to the *Get Up and Dance* Facebook page, one fan commented, "is this [J]ust

18 [D]ance!?!?"  Ex. Q (*Get Up and Dance* Facebook Page).  Particularly in light of the fact that

19 consumer confusion is apparent even before the release of OG's accused product, this factor weighs

20 in Ubisoft's favor. In sum, all relevant factors demonstrate that Ubisoft is likely to succeed in

21 establishing a likelihood of consumer confusion.  And because Ubisoft's trade dress is nonfunctional

22 and inherently distinctive, Ubisoft is likely to succeed on its trade dress infringement claim.

23 **B.     Ubisoft Will Suffer Irreparable Harm without Injunctive Relief.**

24 Ubisoft will suffer irreparable harm unless the Court enjoins the release of OG's *Get Up and*

25 *Dance* video game.  Both market dynamics and the franchise status of Ubisoft's *Just Dance* series

26 significantly exacerbate the ordinary risks of irreparable harm.  Every potential *Just Dance* consumer

27 that is lost to *Get Up and Dance* creates a cascading and incalculable harmful effect in the context of

28 MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
11-CV-4980

1   the video game market and, particularly, a franchise game in that market.

2       Ubisoft has achieved and established a growing base of loyal *Just Dance* customers by

3   offering consistently exceptional releases in the *Just Dance* series. Ex. D (Detoc Dec. ¶ 14). This

4   brand momentum extends beyond sales of future franchise releases to already-established customers,

5   but further fosters growth among additional new customers. *Id.* The fact that existing customers

6   will buy *Just Dance 3*, for example, will cause that game to trend toward the top of various game

7   bestseller lists, which are often reviewed by new customers looking to purchase a game. Ex. D

8   (Detoc Dec. ¶ 14); Ex. J (Amazon Best Sellers List for October 7, 2011; Wal-Mart Best Sellers List

9   for October 7, 2011). Accordingly, every sale of *Get Up and Dance* that would have gone to *Just*

10  *Dance* negatively impacts *Just Dance*'s market momentum and associated ability to attract new

11  customers to the franchise. Ex. D (Detoc Dec. ¶ 14). In the dynamic, popularity driven video game

12  market, the loss of new customers has a far greater impact than the loss of the sale of one game. *Id.*

13  These harms cannot be accurately quantified in terms of monetary loss. *Id.*

14      In the context of a franchise game, however, the irreparable harm goes even further.

15  Franchise loyalty also generates significant benefits with existing and newly acquired customers.

16  (*Id.* ¶ 15). Customers who buy one game from the *Just Dance* series very often return to buy other

17  existing and/or future games in the *Just Dance* series. *Id.* For example, customers who first

18  purchase the original *Just Dance* often buy subsequent "upstream" releases in the *Just Dance* series

19  because of the additional features and song lists. *Id.* Additionally, customers who first purchase a

20  recently-released *Just Dance* game (such as *Just Dance 3*) often buy previously-released

21  "downstream" games (such as *Just Dance* and *Just Dance 2*) for additional variety in song lists and

22  functionality. *Id.* In fact, *Just Dance 3*'s pre-release sales numbers alone made it the second most

23  popular Wii video game. Ex. J (Amazon Best Sellers List for October 7, 2011; Wal-Mart Best

24  Sellers List for October 7, 2011). In addition, Ubisoft's older *Just Dance* titles – the original *Just*

25  *Dance* and *Just Dance 2* – have resurged in parallel into the top 15 best selling Wii games. Ex. J

26  (Wal-Mart Best Sellers List for October 7, 2011). Accordingly, if a customer is persuaded to

27  purchase *Get Up and Dance* instead of *Just Dance*, it is likely that Ubisoft would lose that customer

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
    11-CV-4980

1   across the *Just Dance* brand. *Id.* Ubisoft has no method for calculating the impact of these various

2   losses that would occur. *Id.*

3        Even the ways in which *Get Up and Dance* seeks to draw consumers away from *Just Dance*

4   results in distinct forms of irreparable harm. First, because *Get Up and Dance* visually appears

5   substantially similar to Ubisoft's *Just Dance* franchise in key identifying elements, customers may

6   perceive that *Get Up and Dance* actually is a *Just Dance* game, or that it is a less expensive version

7   of a *Just Dance* game. (*Id.* ¶ 13). Ubisoft has invested both intellectual and monetary capital in

8   fostering quality and consistency across the entire *Just Dance* series. Ubisoft's copyrighted

9   expression and trade dress have remained consistent across all releases in the *Just Dance* series, and

10  Ubisoft's trade dress serves importantly to identify each new *Just Dance* title as a member of the

11  most popular dance-genre video game series. OG's entry in the market will strip Ubisoft of its

12  power to maintain the brand consistency that *Just Dance* consumers have come to expect. (*Id.* ¶ 13).

13  This loss of brand consistency will inevitably damage the goodwill Ubisoft has established. *See*

14  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (finding loss of

15  goodwill is an important factor of irreparable harm).

16       Second, *Get Up and Dance* – sold at $29.99 – $10 less than the *Just Dance* series – may pull

17  consumers away from *Just Dance* because it is cheaper. Ex. D (Detoc Dec. ¶ 12). Again, loss of

18  such sales in the bestseller driven video game marketplace will work incalculable harm on Ubisoft.

19  Furthermore, OG's price undercutting strategy threatens price erosion as customers will question

20  why Ubisoft's *Just Dance* games are not similarly priced. Ex. D (Detoc Dec. ¶ 12). *See Mint, Inc. v.*

21  *Iddi Amad*, 2011 U.S. Dist. LEXIS 49813 (S.D.N.Y. May 9, 2011) (enjoining copyright

22  infringement, in part, because price erosion constituted irreparable harm). If OG is allowed to enter

23  the market with a less expensive video game that looks and feels like *Just Dance,* Ubisoft may never

24  be able to charge $39.99 for any game in the *Just Dance* series again. Ex. D (Detoc Dec. ¶ 12).

25  Even if OG's product is ultimately removed from the marketplace as a result of further litigation,

26  once a consumer sees a substantially similar product for 25% less, that consumer may never be

27  willing to pay $39.99 again. *See Flag Fables, Inc. v. Jean Ann's Country Flags & Crafts, Inc.*, 730

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
    11-CV-4980

1  F. Supp. 1165, 1174 (D. Mass. 1989) (finding irreparable harm due in part to "consumer questions

2  regarding the pricing of the plaintiff's work, in light of the defendants' lower charge").  This will

3  impact games up and down the franchise to an extent that cannot be measured.

4      **C.**    **The Balance of Hardships Tips Decidedly in Ubisoft's Favor.**

5      Courts must also "balance the competing claims of injury and must consider the effect on

6  each party of the granting or withholding" a preliminary injunction.  *Flexible Lifeline Sys. v.*

7  *Precision Lift, Inc.*, 2011 U.S. App. LEXIS 17462 (9th Cir. Mont. Aug. 22, 2011) (quoting *Winter v.*

8  *NRDC, Inc.*, 555 U.S. 7, 24 (2008)).  Here, the balance of equities heavily favors Ubisoft.

9      First, absent the requested injunction, Ubisoft stands to lose sales and long-term market share

10  to an extent which simply cannot be measured, and may be forced to reduce prices across its *Just*

11  *Dance* series.  Ubisoft has invested substantial intellectual and financial capital into growing the

12  successful *Just Dance* series, and OG cannot ride the coattails of Ubisoft's success.

13      Second, any harm that would result to OG as a result of the requested preliminary injunction

14  was assumed by OG when they chose to copy Ubisoft's copyrighted expression and trade dress.  As

15  is evidenced by the many competitors successfully competing in the marketplace without using

16  Ubisoft's intellectual property, OG could easily have avoided infringement by not incorporating

17  nearly identical copies of Ubisoft's most prominent visual features.  Moreover, OG needs only move

18  away from Ubisoft's expression in order to bring to market a game that fairly competes.  This burden

19  is comparatively small to the irreparable harm Ubisoft stands to endure if the Court does not enjoin

20  OG's release of *Get Up and Dance*.

21      **D.**    **The Public Interest is Served by Enjoining the Release of OG's Infringing Video**

22          **Game.**

23      The public interest is served by enjoining the release of OG's infringing video game.

24  Protecting copyrights is in the public interest.  *See Warner Bros. Entm't, Inc. v. WTV Sys.*, 2011 U.S.

25  Dist. LEXIS 107772 (C.D. Cal. Aug. 1, 2011) ("it is virtually axiomatic that the public interest can

26  only be served by upholding copyright protections").  Similarly, the heart of trade dress enforcement

27  is to "avoid consumer confusion, which is in the public interest."  *Caesars World, Inc. v. Milanian*,

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION
                    11-CV-4980

1    247 F. Supp. 2d 1171, 1205 (D. Nev. 2003).   Further, no compelling public interest argument

2    supports allowing OG to release an infringing game.

3    **III.     CONCLUSION**

4          OG's planned release of *Get Up and Dance* on November 1, 2011 will infringe Ubisoft's

5    valuable copyrights and trade dress.   Because Ubisoft is likely to succeed on the merits and has

6    demonstrated significant irreparable harm, it respectfully requests the Court preliminary enjoin

7    Defendants from releasing *Get Up and Dance*.

Dated: October 12, 2011                    **SHOOK, HARDY & BACON**

                                           By: _____

                                              Andrew L. Chang
                                              Attorneys for UBISOFT ENTERTAINMENT and
                                              UBISOFT, INC.