William Sloan Coats (State Bar No. 94864)
william.coats@kayescholer.com
Jennifer L. Co (State Bar No. 264043)
jennifer.co@kayescholer.com
Taryn Lam (State Bar No. 236124)
taryn.lam@kayescholer.com
KAYE SCHOLER LLP
Two Palo Alto Square, Suite 400
3000 El Camino Real
Palo Alto, CA 94306
Telephone:  (650) 319-4500
Facsimile:  (650) 319-4700

Attorneys for Plaintiffs
OG International and O-Games USA

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| OG International and O-Games USA,<br><br>　　　　　Plaintiffs<br><br>　　v.<br><br>Ubisoft Entertainment S.A. and Ubisoft, Inc.<br><br>　　　　　Defendants | Case No. 11-CV-4980 CRB<br><br>**PLAINTIFFS' OPPOSITION TO UBISOFT'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Hearing: October 21, 2011, 10:00 A.M., Courtroom 6 |

KAYE SCHOLER LLP

I.      INTRODUCTION ..................................................................................................... 1

II.     BACKGROUND ...................................................................................................... 2

        A.    The Parties ................................................................................................... 2

        B.    OGI's Development of Get Up and Dance ................................................. 2

III.    UBISOFT HAS FAILED TO MAKE THE  REQUISITE SHOWING FOR THE
        EXTRAORDINARY UPFRONT INJUNCTION IT SEEKS ................................. 4

        A.    The Courts Apply a Rigorous Standard for TROs and Preliminary
              Injunctions .................................................................................................. 4

        B.    Ubisoft Has Not Shown Likelihood of Success on Its Copyright Claims ............. 5

              1.    Ubisoft's Claimed Features Are Not Eligible for Copyright
                    Protection .......................................................................................... 5

              2.    Ubisoft Cannot Establish "Copying" ................................................ 7

              3.    OGI's Independent Creation of Its Avatars and Instructors Is a
                    Complete Defense to Any Alleged Infringement. ............................. 11

        C.    Ubisoft Has Not Shown Likelihood of Success on Its Trade Dress Claims ........ 12

              1.    The Avatars and Instructors Are Functional Features of the Just
                    Dance Games ................................................................................... 12

              2.    The Avatars and The Instructors Are Not Distinctive ..................... 17

              3.    There Is No Likelihood of Confusion Between the Just Dance Games
                    and Get Up and Dance. .................................................................... 18

        D.    Ubisoft Has Not Established the Potential for "Irreparable Harm" ..................... 21

        E.    The Granting of a Preliminary Injunction Would Substantially and
              Disproportionally Harm OGI ................................................................... 22

        F.    A TRO and Preliminary Injunction is Not in the Public Interest ......................... 24

IV.     CONCLUSION ....................................................................................................... 25

KAYE SCHOLER LLP

**TABLE OF AUTHORITIES**

**Cases**

*Amoco Prod. Co. v. Village of Gambell, AK*,
    480 U.S. 531 (1987)............................................................................................ 23

*Atari, Inc. v. North American Philips Consumer Electronics Corp.*,
    672 F.2d 607 (7th Cir. 1982) ............................................................................ 10

*Bell Atlantic Bus. Sys., Inc. v. Storage Tech. Corp.*,
    No. C-94-0235 MHP, 1994 WL 125173 (N.D. Cal. March 31, 1994) ............. 21

*Bethea v. Burnett*,
    No. CV04-7690JFWPLAX, 2005 WL 1720631 (C.D. Cal. June 28, 2005) .......... 12

*Blehm v. Jacobs*,
    No. 09-cv-02865, 2011 WL 4369051, at *5 (D. Colo. Sept. 19, 2011)................ 7, 12

*Brookfield Communications, Inc. v. West Coast Entm't Corp.*,
    174 F.3d 1036 (9th Cir. 1999) .................................................................... 18, 19

*Cal. Apartment Association v. San Diego County Apartment Association, Inc.*,
    No. 11cv300-WQH-RBB, 2011 WL 1002667 (S.D. Cal. March 18, 2011).............. 21

*Clicks Billiards, Inc. v. Six Shooters, Inc.*,
    251 F.3d 1252 (9th Cir. 2001) ........................................................................... 12

*Cosmos Jewelry Ltd. v. Po Sun Hon Co.*,
    470 F. Supp. 2d 1072 (C.D. Cal. 2006) ............................................................... 7

*Data East USA, Inc. v. Epyx, Inc.*,
    862 F.2d 204 (9th Cir. 1988) ..................................................................... 7, 9, 10

*Disc Golf* .......................................................................................................... 14

*Disc Golf Ass'n, Inc* ................................................................................... 13, 16

*Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*,
    158 F.3d 1002, 1006 (9th Cir. 1998) .................................................................. 12

*Dreamwerks Prod. Grp., Inc. v. SKG Studio*,
    142 F.3d 1127 (9th Cir. 1998) ........................................................................... 18

*Excelligence Learning Corp. v. Oriental Trading Co., Inc.*,
    No. C 03–4947 JF, 2004 WL 2944048 (N.D. Cal. Dec. 20, 2004) ...................... 6

*Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*,
    741 F. Supp. 2d 1165 (C.D. Cal. 2010). ............................................................ 17

*First Brands Corp. v. Fred Meyer, Inc.*,
    809 F.2d 1378 (9th Cir. 1987) ..................................................................... 14, 19

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
    58 F.3d 27 (2d Cir. 1995) .................................................................................. 17

*Kerr Corp. v. N. Am. Dental Wholesalers, Inc.*,
    2011 WL 2269991 (C.D. Cal. June 9, 2011) ..................................................... 22

*Leatherman Tool Group* ..................................................................................... 14

*Leatherman Tool Group, Inc. v. Cooper Indus*................................................... 16

*Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*,
    199 F.3d 1009 (9th Cir. 1999) ........................................................................... 13

*Leatt Corp. v. Innovative Safety Tech., LLC*,
    No. 09-cv-13-1-LEG,2010 WL 1526382 (S.D. Cal. April 15, 2010).............. 21

ii

KAYE SCHOLER LLP

*Mattel, Inc. v. MGA Entm't, Inc.*,
   616 F.3d 904 (9th Cir. 2010) ................................................................................ 8, 10

*Miss World (UK), Ltd. v. Mrs. America Pageants, Inc.*,
   856 F.2d 1445 (9th Cir. 1988) ...................................................................................... 21

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
   16 F.3d 1032 (9th Cir. 1994) ......................................................................................... 24

*Oracle America, Inc. v. Google Inc.*,
   No. C 10-03561, 2011 WL 4336691 (N.D. Cal. Sept. 15, 2011) ..................................... 9

*Pasillas v. McDonald's Corp.*,
   927 F.2d 440 (9th Cir. 1991) ........................................................................................... 6

*Qualitex Co. v. Jacobson Prods. Co. Inc.*
    514 U.S. 159 (1995) ...................................................................................................... 16

*Rice v. Fox Broadcasting Co.*,
   330 F.3d 1170 (9th Cir. 2003) .......................................................................................... 8

*Rice*,   8

*Sega Enters. Ltd. v. Accolade, Inc.*,
   977 F.2d 1510 (9th Cir. 1992) ......................................................................................... 13

*SRI Int'l. v. Acoustic Imaging Techs. Corp.*,
   No. C–92–5015–VRW, 1993 WL 356896 (N.D. Cal. Sept. 3, 1993) ............................ 24

*Straughter v. Raymond*,
   CV 08–2170, 2011 WL 3651350, at *13 (C.D. Cal. Aug. 19, 2011) ................................ 8

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
   240 F.3d 832 (9th Cir. 2001) ............................................................................................ 5

*TMX Funding, Inc. v. Impero Techs., Inc.*,
   No. C10-00202 JF (PVT), 2010 WL 1028254 (N.D. Cal. March 18, 2010) ................... 22

*Universal Athletic Sales Co. v. Salkeld*,
   511 F.2d 904 (3d Cir. 1975) .............................................................................................. 7

*Watermark, Inc. v. United Stations, Inc.*,
   219 U.S.P.Q. 31 (C.D. Cal. 1982) ..................................................................................... 5

*Windermere Holdings, LLC v. U.S. Wall Décor, LLC*,
   No. C 10-03955 LB, 2011 WL 133023 (N.D. Cal. Jan. 14, 2011) .................................... 5

**Statutes**

37 C.F.R. § 202.1 ................................................................................................................ 6

**Other Authorities**

*Disc Golf Ass'n, Inc.* ................................................................................................... 15, 16

*Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*,
   103 F.3d 196 (1st Cir. 1996) ........................................................................................... 19

J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 23:14 (4th ed.
   2007) ............................................................................................................................... 19

*Leatherman Tool Group,* .................................................................................................. 15

W.J. McCarthy, McCarthy on Trademarks and Unfair Competition,
   § 7:75 at 7-156 (4th Ed. 1998) ..................................................................................... 15

# I.    INTRODUCTION

The Court should deny the motion of Ubisoft Entertainment, S.A., and Ubisoft, Inc. (collectively, "Ubisoft") for a temporary restraining order ("TRO") and preliminary injunction against OG International Ltd. and its U.S. subsidiary, O-Games, Inc. (collectively, "OGI"). Ubisoft fails to satisfy any of the fundamental requirements for preliminary injunctive relief, when it must satisfy them all.

Far from demonstrating a likelihood of success on its copyright and trademark infringement claims, Ubisoft fails to show its claims can even survive beyond the pleading stage. Ubisoft's copyright and trade dress claims are based on generic, commonly used features -- such as use of the color white and stick figures -- that do not qualify for protection at all.  In addition to that fatal flaw, Ubisoft fails to provide any probative evidence.  Instead, it relies on manipulated screenshots and material taken out of context in an effort to mask the differences between the claimed features of its dance video game, *Just Dance*, and OGI's dance video game, *Get Up and Dance*.  But Ubisoft's attempt to manufacture similarities fails, as an accurate comparison of the claimed features demonstrates the substantial differences between the two works.

Ubisoft also fails to demonstrate irreparable harm, as its allegations of harm are speculative at best, and are belied by Ubisoft's months-long delay in seeking relief.  In contrast, OGI would sustain real and significant harm to its fledgling U.S. video game business if a preliminary injunction is granted.  Ubisoft has purposefully timed its motion to maximize the harm to OGI's business.  With the release date of *Get Up and Dance* only three weeks away, if Ubisoft's motion is granted, OGI will miss out on the Christmas shopping season, the most important time of year for video game sales, just as it is struggling to gain a foothold in that market.

At bottom, Ubisoft's motion is a transparent attempt to misuse the litigation system to keep the newcomer OGI out of the dance video game market and to ruin any chances of success for OGI's competing dance game.  For the foregoing reasons, and those discussed below, the Court should deny Ubisoft's motion for a TRO and preliminary injunction.

## II.    BACKGROUND

### A.    The Parties

In its opening papers, Ubisoft boasts of the size and variety of its video game business. Ubisoft's Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order and Preliminary Injunction ("Ubisoft Br."), at 2-3.  As the 3rd largest independent video game publisher in the U.S., Ubisoft has sold hundreds of millions of the video games in its portfolio of 20 different franchises during its 25-year history.  *Id.* at 3.  Ubisoft's portfolio includes a variety of dance video games, including *Dance on Broadway*, *Michael Jackson Experience*, *Smurfs Dance Party*, and the *Just Dance* games at issue here.  Declaration of William Sloan Coats in Support of Plaintiffs' Opposition to Ubisoft's Motion for Temporary Restraining Order and Preliminary Injunction ("Coats Decl.") Ex. F.  Ubisoft's *Just Dance* games have been sold since 2009.

In contrast to Ubisoft's vast video game empire, OGI is a recent entrant to the U.S. video game market.  Collectively, OG International Ltd. and its U.S. subsidiary O-Games Inc. have a total of nine employees.  O-Games, Inc.'s best-selling game, *My Make-Up*, has had limited sales (78,000 units), and O-Games, Inc. does not have any direct accounts at any of the major video game retail chains.  Declaration of James Scott in Support of Plaintiff's Opposition to Ubisoft's Motion for Temporary Restraining Order and Preliminary Injunction ("Scott Decl.") ¶ 5.

### B.    OGI's Development of *Get Up and Dance*

In December 2010, recognizing the popularity of dancing, fitness, and singing video games, OGI decided to create a franchise focused on dancing and singing video games, ultimately choosing to launch separate products focused on these activities: *Get Up and Dance* and *Get Up and Sing*.  Scott Decl. ¶ 17.  The game would feature live dancers, not animated or motion capture figures, performing against the backdrop of popular music videos.   A unique feature of Up and Dance that is not found in any other dance video game on the market, including the Just Dance Games, is the background comprised of official music videos, a core concept of the Get Up and Dance Game  *Id.* ¶ 17.  As a result of the use of music video backgrounds, there is significant

KAYE SCHOLER LLP

variety in the games appearance because the particular music video influences the style of dance, the dancer's appearance, and the entire screen. *Id.*

In early 2011, OGI hired video game developer, Gusto Games, to create the *Get Up and Dance* game. Declaration of Mark Mainey in Support of Plaintiff's Opposition to Ubisoft's Motion for Temporary Restraining Order and Preliminary Injunction ("Mainey Decl.") ¶ 5. Although Gusto Games has significant experience using motion capture techniques in other games, OGI wanted the game to feature the official music videos in the background and, because of this, the dancers in the game needed to appear more realistic in the fluidity of their movements and in the way their hair and clothing would react to such movement. *Id.* ¶ 6; Scott Decl. ¶ 20. In order to accomplish this, Gusto Games filmed dancers live against a green screen instead of using motion capture. Mainey Decl. ¶ 6; Scott Decl. ¶ 20. The results of the live filming were successful, which, combined with the time and cost efficiencies presented by live action footage over motion capture, encouraged OGI and Gusto Games to proceed with live filming. Mainey Decl. ¶¶ 6-9 (motion capture requires several steps beyond filming, including the creation of models and rigs for *each* character and the clean-up of faulty motion capture data, whereas live action filming requires only chroma keying and color adjustments).

Gusto Games together with provided Mezzo Forte Dance Company with the tracklist for *Get Up and Dance* as they became available and the dance company created choreography and selected appropriate dancers, costumes, and make-up for the songs and videos on the tracklist. *Id.* ¶ 10. Gusto Games' Creative Lead suggested possible artistic treatments for the dancers in the foreground, and OGI chose the concept of using flat colors to depict the dancers in order to sharpen the contrast between the dancers in the foreground and the wide variety of music videos – and the multitude and mixture of colors therein – that could be playing in the background. *Id.* ¶ 11.

During early testing of the live action filming on April 6, 2011, OGI and Gusto Games found that, even though the dancers were bathed in bright lights when performing, the footage showed shadows on their faces, as well as perspiration resulting from the bright lights illuminating the performance, both of which would have made the chroma keying process

difficult and thwarted the goal of creating the flat style desired because of the presence of multiple shades of colors. *Id.* ¶¶ 12 & 16. In an attempt to fix this problem, Gusto Games asked the dancers to wear white makeup during the subsequent choreography shoot in order to even out the color and eliminate shadows in the footage. *Id.* ¶ 13. The heavier the white makeup, the better the resulting footage and the greater the contrast between the dancers' faces and their hair. *Id.* ¶¶ 14 (the thicker makeup created better color consistency and stood up better to the heat of the lights) & 15 (the majority of the dancers had fair hair).

Gusto Games provided OGI with possible artistic treatments for the dancers in front of the music video. Ultimately, OGI and Gusto Games only considered black or white skin on the dancers because any other solid skin color would clash with either the clothing colors or the colors in the music video behind the dancers. *Id.* ¶ 17; Scott Decl. ¶ 21. Ultimately, OGI and Gusto Games decided to proceed with white skin on the dancers in order to create a more striking contrast against the rest of the elements of the game: (1) the background for the dancers was already black; (2) the music videos included a myriad of colors against which white would stand out more; and (3) OGI wanted to be able to have the dancers wear black clothing, a common clothing color choice in music videos, including several of those featured in *Get Up and Dance* (*e.g.*, Nicole Scherzinger's *Poison* video). Mainey Decl. ¶ 19; Scott Decl. ¶ 21.

Finally, Gusto Games recognized that the instructor images needed to be simple visual clues to the next arm, leg, and other movements in the dance sequence, so as not to distract too much from the player's focus on the dancer in front of the music video. Mainey Decl. ¶ 19; Scott Decl. ¶ 22. Gusto Games decided that stick figures would best serve that purpose given their simple design and universal usage and recognition (*e.g.*, traffic signs, warning signs, restroom signs). Mainey Decl. ¶ 19; Scott Decl. ¶ 22.

## III. UBISOFT HAS FAILED TO MAKE THE REQUISITE SHOWING FOR THE EXTRAORDINARY UPFRONT INJUNCTION IT SEEKS

### A. The Courts Apply a Rigorous Standard for TROs and Preliminary Injunctions

This Court has recognized that a TRO is an "extraordinary remedy," to be awarded only where the applicant has made a *clear* showing of entitlement to such relief. *Windermere*

KAYE SCHOLER LLP

*Holdings, LLC v. U.S. Wall Décor, LLC*, No. C 10-03955 LB, 2011 WL 133023, at *1 (N.D. Cal. Jan. 14, 2011) (denying TRO request); *see also Watermark, Inc. v. United Stations, Inc.*, 219 U.S.P.Q. 31, 32-33 (C.D. Cal. 1982) (*citing Dymo Industries, Inc. v. Tapeprinter, Inc.*, 326 F.2d 141 (9th Cir. 1964)) (recognizing that injunctive relief before trial is a "harsh and extraordinary remedy" to be granted "sparingly").

As the party seeking a TRO and preliminary injunction, Ubisoft must show: (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (setting forth four-element test for preliminary injunctions); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,* 240 F.3d 832, 839 n.7 (9th Cir. 2001) (requests for temporary restraining orders are governed by the same general standards that govern the issuance of a preliminary injunction).

Ubisoft's motion fails all four elements of the Supreme Court's *Winter* test, and therefore must be denied. Ubisoft is unlikely to succeed on its copyright and trade dress claims. Ubisoft fails to establish the potential for "irreparable harm." Conversely, the granting of a TRO/preliminary injunction would substantially harm OGI and is not in the public interest.

## B. Ubisoft Has Not Shown Likelihood of Success on Its Copyright Claims

Far from having a likelihood of success, Ubisoft's copyright claims fail on multiple levels. As an initial matter, Ubisoft has not shown and cannot show that the claimed features of its *Just Dance* game -- *i.e.*, the use of white skin and bright clothes for the "avatars" and the use of stick-figures as "instructors" -- are protectable by copyright. Beyond failing to establish that the claimed feature are copyrightable, Ubisoft cannot prove "copying" under the "substantially similar" standard -- let alone the more rigorous "virtually identical" standard that should apply -- because there are substantial differences between the avatars and instructors in, respectively, Ubisoft's *Just Dance* and OGI's *Get Up and Dance*. Further, OGI's independent development of the avatars and instructors in *Get Up and Dance* is a complete defense to Ubisoft's claims.

### 1. Ubisoft's Claimed Features Are Not Eligible for Copyright Protection

5

60438904_3.DOCX  PLAINTIFFS' OPPOSITION TO UBISOFT'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION CASE NO. C11-CV-4980 CRB

KAYE SCHOLER LLP

Ubisoft's copyright infringement claims accuse OGI of copying the "avatars' partially silhouetted stylized dancers with white skin and bright clothing," and the stick-figure instructors, in *Just Dance*.[1] These features of *Just Dance* are not expressions entitled to protection under the copyright laws, and therefore Ubisoft's copyright infringement claims fail from the get-go.

a. **The White Skin and Brightly Colored Clothing of Ubisoft's Avatars Are Not Copyrightable**

Ubisoft cannot copyright the color white, nor can it copyright bright colors for clothing, that it uses for the avatars in its video game. The use of one color versus another is inherently uncopyrightable. 37 C.F.R. § 202.1 ("[E]xamples of works not subject to copyright [include] ... mere variations of ... color"); U.S. Copyright Office, Compendium II, Copyright Office Practices § 503.02(a) (1984) ("[M]ere coloration cannot support a copyright even though it may enhance the aesthetic appeal or commercial value of a work.").

The color white is not copyrightable. Thus, for example, a white color used to depict the man on the moon was not a protected element because it was a commonly used color for man on the moon drawings. *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 443 (9th Cir. 1991). The Ninth Circuit has held that where there is a limited number of color choices available, the decision to use a certain color is not subject to copyright protection. Here, as explained in section II.B above, there is a limited number of color options for realistic depiction of a human dancer's skin, especially in the context of a dance game video in which the avatar needs to stand out from the myriad colors, or dark shades, in the background.

Likewise, the use of bright colors to present a product in a fun and whimsical light is not copyrightable expression. *See Excelligence Learning Corp. v. Oriental Trading Co., Inc.*, No. C 03–4947 JF, 2004 WL 2944048, at *12 (N.D. Cal. Dec. 20, 2004). Moreover, color is unprotected when it depicts the intrinsic characteristic of a rendering material. *See Cosmos*

---

[1] As no certificate of registration has issued covering Ubisoft's alleged copyrights in *Just Dance*, and it is unclear whether the registrations would include the specific features claimed in Ubisoft's motion, there is no presumption of copyright validity or ownership.

*Jewelry Ltd. v. Po Sun Hon Co.*, 470 F.Supp.2d 1072, 1082 (C.D. Cal. 2006). It is commonplace for clothing to be brightly colored, especially in the context of a dance video game.

Simply put, Ubisoft's claimed use of the color white for its avatars' skin, and claimed use of bright colors in the avatars' clothing, are not features eligible for copyright protection.

b.    **Ubisoft's Use of Stick Figures as Instructors Is Not Copyrightable**

Nor can Ubisoft copyright the use of stick figures. Ubisoft uses stick figures as instructors in its *Just Dance* games, and claims that OGI's use of stick-figure instructors in *Get Up and Dance* is copyright infringement. Ubisoft's claim fails as a matter of law. Stick figures are ubiquitous, and numerous courts have held that stick figures "are by definition simple," and their use involves only "minimal amount of creativity." *Blehm v. Jacobs*, No. 09-cv-02865, 2011 WL 4369051, at *5 (D. Colo. Sept. 19, 2011); *Universal Athletic Sales Co. v. Salkeld*, 511 F.2d 904, 909 (3d Cir. 1975).

Furthermore, there are only so many ways to depict dance poses for the human body, especially in the instructional-based dance video game context. Ubisoft's use of stick figures to demonstrate dance moves fall outside the realm of copyrightable creative expression, especially when, as here, the dances moves (or poses) mimic actual moves (or poses) of human dancers. *Blehm*, 2011 WL 4369051, at *5 ("poses are excluded from [copyright] protection to the extent such poses are suggested by the activities themselves"). It is plain and simple, like the stick figures themselves, that Ubisoft's use of stick figures as instructors in its *Just Dance* games is not entitled to copyright protection.

2.    **Ubisoft Cannot Establish "Copying"**

A claim for copyright infringement requires proof of ownership of a valid copyright and "copying" of the copyrighted work. *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 206 (9th Cir. 1988). "It is an axiom of copyright law that copyright protects only an author's expression of an idea, not the idea itself." *Id*. at 207. In view of this axiom's corollary that "others may freely copy a work's ideas (and other unprotectable elements)," the Ninth Circuit employs a two-part

KAYE SCHOLER LLP

"extrinsic/intrinsic" test to "distinguish between permissible lifting of ideas and impermissible copying of expression." *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 913 (9th Cir. 2010).

The purpose of the first part (or "extrinsic stage") of the test is to "determine whether the similar elements are protectable or unprotectable." *Id*. To this end, the starting point is to determine "the breadth of possible expression of those ideas." *Id*. If there is a wide range of possible expression, then "a work will infringe if it's 'substantially similar' to the copyrighted work." *Id*. at 713-14 (citations omitted). If there is a narrow range of possible expression, "then copyright protection is 'thin' and a work must be 'virtually identical' to infringe." *Id*. at 914 (citations omitted). The appropriate standard -- "substantially similar" or "virtually identical" -- is then applied in the second part (or "intrinsic" stage) of the test. There the focus is "whether an ordinary reasonable observer would consider the copyrighted and challenged works substantially similar (or virtually identical)." *Id*.

As we show below, the appropriate standard in this case is "virtually identical" -- because there is only a narrow range of expression of avatars and instructors in an instructional-based dance video game such as *Just Dance* and *Get Up and Dance* -- but Ubisoft's copyright claims fail whether that standard or the "substantially identical" standard is applied, because there are substantial differences between the parties' respective avatars and instructors.[2]

a. **The Claimed Avatar and Instructor Features Are Not Protectable Expressions**

---

[2] Ubisoft erroneously argues that it is entitled to the lower "substantially similar" standard solely because the wide commercial availability of the *Just Dance* video games gave OGI "access" to the copyrighted features. Ubisoft Br. at 10. Ubisoft is presumably attempting to invoke the "inverse ratio rule," which applies where a *high* degree of access is established. *See Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003). Ubisoft has not shown that OGI had a high degree of access, as widespread dissemination of the copyrighted work, by itself, is not enough. *See Straughter v. Raymond*, CV 08–2170, 2011 WL 3651350, at *13 (C.D. Cal. Aug. 19, 2011). Usually, the accused party's concession of access is required for application of the inverse ratio rule. *See Straughter*, 2011 WL 3651350, at *13; *Rice*, 330 F.3d at 1178-79. Ubisoft's attempt to rely on the "inverse ratio rule" to secure the lower standard of proof is misplaced, not only because it is inapplicable here but also because Ubisoft could not meet the lower "substantially similar" standard in any event.

Ubisoft's claimed elements -- white-skinned, brightly clothed avatars and stick-figure instructors -- are not protectable expressions of ideas, but rather features that necessarily flow from the idea of an instructional-based dance video game. The choice of one type of avatar versus another depends heavily on the type of dance game. In contrast to dance-mat games or rhythm-based games, instructional-based games like Just Dance and Get Up and Dance usually use avatars modeled on real-life choreographed human dancers. *Id*. The situation presented here is strikingly similar to the situation presented in *Data East*, in which the Ninth Circuit held that generic features that necessarily followed from the idea of a karate combat video game and that were standard treatment of the karate sport, are not protectable under copyright law. 862 F.2d at 209. In *Data East*, the Ninth Circuit recognized that there are a limited number of ways to visually depict a karate match, with the constraints inherent in the sport and constraints inherent in the use of computers to play the game. *Id*. Such constraints included the common moves of the sport, the manner of scoring, the number of combatants, limitations upon the use of color in one visual image, and the use of special techniques for creating mobile graphic computer images. *Id*. Features that follow from such constraints are not copyrightable expression. *Id.*

Like the realistic depiction of karate matches in the computer video game context, the realistic depiction of dance in the instructional-based dance video game context is subject to certain constraints that dictate the use of elements common to such games. As further explained in Section III.C.1.b. *infra*, the use of avatars with white skin and bright clothing that stand out against a background so as to be readily followed by the player, and the use of stick figures to demonstrate upcoming dance moves, are common features of instructional-based dance video games such as *Get Up and Dance* and *Just Dance*. As such, these features claimed by Ubisoft are not eligible for copyright protection. *See also Oracle America, Inc. v. Google Inc.*, No. C 10-03561, 2011 WL 4336691, at *6 (N.D. Cal. Sept. 15, 2011) (holding that commonplace expressions naturally associated with the treatment of a given idea are not protected by copyright).

In arguing that its claimed features are entitled to copyright protection, Ubisoft relies on a decision from the Seventh Circuit, *Atari, Inc. v. North American Philips Consumer Electronics*

KAYE SCHOLER LLP

*Corp.*, 672 F.2d 607 (7th Cir. 1982). Ubisoft's reliance on *Atari* is misplaced. At issue in *Atari* was the Pac-man video game, which featured monsters and other creatures of fantasy chasing one another through different settings. There are countless ways to express fanciful monsters, countless ways to express monsters' movements, countless ways for a player to earn points based on monster chases, and countless settings through which fanciful creatures can chase one another. *See Mattel*, 616 F.3d at 913 (noting "gazillions of ways to make an aliens-attack movie").

Whereas there is a wide range of expression of monsters and other fanciful creatures chasing each other through any given number of settings, there is only a limited number of ways to express dancers dancing in a non-animated, instructional-based dance video game. Like karate, dance is "not susceptible of a wholly fanciful presentation." *Data East*, 862 F.2d at 209.

Accordingly, Ubisoft must show identical copying by OGI. *See Data East*, 862 F.2d at 209 ("When idea and expression coincide, there will be protection against nothing other than identical copying") (citation omitted). Ubisoft has not presented any evidence of identical copying. Far from being "virtually identical," the avatars and instructors in OGI's Get Up and Dance are substantially different than those in the Just Dance games.

> b.    **The Ordinary Observer Would Not Consider the Avatars and Instructors in *Get Up and Dance* and *Just Dance* to Be Substantial Similar, Much Less Identical.**

In an effort to manufacture similarities while concealing the differences between *Get Up and Dance* and *Just Dance*, Ubisoft has submitted manipulated screenshots of *Get Up and Dance* avatars in which portions of the actual in-game background is cropped out. By this manipulation, Ubisoft makes the avatars appear larger and more prominent than they actually are, and conceals the unique background of *Get Up and Dance*, comprised of official music videos (versus the non-video backgrounds in *Just Dance*). For a true comparison, a full and complete screenshot of the *Get Up and Dance* avatar, as compared to *Just Dance* avatars, is provided below, and additional screenshots are provided in Exhibit A to the Coats Declaration filed herewith:

**Just Dance Screenshots**                          **Get Up and Dance Screenshots**

 

Coats Decl. Ex. a.

As shown in the above comparison, there are substantial differences in coloring, size, emphasis, background, and other features of the avatars. The following chart summarizes some of the key differences.

| Ubisoft's *Just Dance* Avatars | OGI's *Get Up and Dance* Avatars |
|---|---|
| Larger size | Smaller size |
| More prominent on screen | Less prominent on screen |
| Bright and colorful clothing, including non-constant color interpolation effect (ombre) | Flatly colored clothing, usually consisting of 3-4 colors with heavier use of black |
| Facial features lost and washed out | Facial features emphasized |
| Overall fun look | Overall sophisticated look |
| Standard backgrounds | Backgrounds comprised of official music videos, as selected by player |

These conspicuous differences would lead a reasonable observer to conclude that the *Get Up and Dance* avatars are not identical to the *Just Dance* avatars. Furthermore, even if the Court were to apply the substantially similar standard, Ubisoft's use of colorful, large, "fun" avatars prominently displayed against a standard backdrop cannot be reasonably viewed as substantially similar to OGI's use of smaller, flatly colored, sophisticated avatars placed against an official music video to be selected by the player. Similarly, OGI's use of pale, flatly colored instructors placed along the left side of the screen is substantially different than Ubisoft's use of figures outlined in neon/glowing white placed along the bottom of the screen and against different backgrounds.

### 3. OGI's Independent Creation of Its Avatars and Instructors Is a Complete Defense to Any Alleged Infringement.

Even if Ubisoft had sufficiently shown infringement of its valid copyrights (which it has not), Ubisoft's copyright claims must fail because OGI's independent creation of the avatars and

instructors in *Get Up and Dance* serves as a complete defense. *See Blehm*, 2011 WL 4369051, at *2 ("Independent creation is a complete defense to a claim of copyright infringement."); *Bethea v. Burnett,* No. CV04-7690JFWPLAX, 2005 WL 1720631, at *15-16 (C.D. Cal. June 28, 2005). As shown in Section II.B. *supra*, OGI independently developed the avatars and instructors in *Get Up and Dance* in accordance with the developers' unique vision and desired core concepts for the game.

### C. Ubisoft Has Not Shown Likelihood of Success on Its Trade Dress Claims

Ubisoft's inability to succeed on its copyright claims is matched by its inability to succeed on its trade dress infringement claims. To establish trade dress infringement, the plaintiff must demonstrate that (1) the claimed trade dress is non-functional, (2) the claimed trade dress either is inherently distinctive or has acquired secondary meaning, and (3) the defendant's product creates a likelihood of confusion under the *Sleekcraft* factors. *Clicks Billiards, Inc. v. Six Shooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001).

As shown below, the avatars and instructors in Ubisoft's *Just Dance* games are functional and commonplace in the dance video game market and, as such, are not protectable trade dress. Accordingly, this Court should have no occasion to reach the second and third elements of the test. In any event, Ubisoft fails to carry its burden on those elements as well, as shown below in turn.

#### 1. The Avatars and Instructors Are Functional Features of the *Just Dance* Games

The party asserting trade dress infringement bears the burden of proving that the alleged trade dress is ***not*** functional. *Clicks Billiards*, 251 F.3d at 1258. A product feature is ***functional*** (1) "if it is essential to the use or purpose of the article," such that it constitutes "the actual benefit that the consumer wishes to purchase" (as opposed to an assurance as to the source of the product), ***or*** (2) "if it affects the cost or quality of the article," in other words, "if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998) (citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995); *Rachel v. Banana Republic, Inc.*, 831 F.2d

1503, 1506 (9th Cir. 1987)); *see also Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1012 (9th Cir. 1999).

Courts consider the following "*Sleekcraft*" factors when assessing whether a product feature is functional: (1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. *Disc Golf Ass'n, Inc.*, 158 F.3d at 1006 (internal citations omitted). Applying these factors compels the conclusion that the claimed features are functional.

a. **The White Skin on the Avatars and the Instructional Figures Provide a Utilitarian Advantage in Terms of Visibility of the Avatars and Teaching Dance Moves.**

"A product feature need only have *some* utilitarian advantage to be considered functional." *Disc Golf Ass'n, Inc.*, 158 F.3d at 1007 (emphasis in original) (citing *Int'l Jensen, Inc. v. Metrosound USA, Inc.*, 4 F.3d 819, 823 (9th Cir. 1993) (stating that the court should consider whether the design "yields *a* utilitarian advantage") (emphasis added)); *see also Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1531 (9th Cir. 1992) (holding that "in order to establish nonfunctionality the party with the burden must demonstrate that the product feature serves *no purpose* other than identification") (emphasis added) (internal quotation marks and citation omitted).

Ubisoft cannot carry its burden to demonstrate that the claimed features serve no purpose other than product identification. Indeed, the purpose of the *Just Dance* games is to teach users how to perform the dance moves featured therein. Coats Decl., Exh. J. The use of instructors in the *Just Dance* games clearly provide a utilitarian advantage inasmuch as they provide step-by-step moves to users seeking to learn the dances. Unlike the other instructional modes Ubisoft references in its papers, the stick figure representation of the instructors in the *Just Dance* games allows users to see how and when they need to move *each* part of their body. Just as there are only so many ways to depict dance moves for the human body, there are only so many ways to display stick figures resembling the human body. The use of stick figures in the *Just Dance*

games thus provides a utilitarian advantage in that it conveys complete instructions for how to perform dance moves, "the actual benefit that the consumer wishes to purchase." *Disc Golf Ass'n, Inc.*, 158 F.3d at 1006.

The white skin of the avatars also serves a functional purpose and provides the *Just Dance* games with a utilitarian advantage over other dance games. The settings of dance games typically feature either dark backgrounds that are broken up by pops of color or bright, color-saturated backgrounds. Coats Decl., Exh. G. In order for the avatars to stand out from the profusion of colors behind them, game developers need to choose skin colors that will contrast sharply with the rest of the image, and a stark white skin best serves that function. OGI chose to use white skin on the dancers for this very reason. Mainey Decl. ¶ 18; Scott Decl. ¶ 21.

Moreover, courts in the Ninth Circuit have recognized that a color may be functional. *See First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1382 (9th Cir. 1987) (recognizing the "color depletion" theory and noting that there are a limited number of colors in the palette). The range of human skin tones is limited, even more so when the goal is to create a strong contrast between the dancer's skin tone and the brightly-colored or dark background of a dance video game. Allowing Ubisoft to protect white as its exclusive color would deplete the palette available to *all* other video game developers and publishers. *See id.* (holding that allowing Prestone to claim the color yellow as trade dress would deplete the available palette).

Ubisoft has proffered no evidence supporting its assertion that the avatars or the instructors exist for any non-functional purpose – much less satisfy its burden of demonstrating that the claimed features serve no purpose other than product identification – or that any feature of those elements of the game were ornamental or meant to signify the source of the *Just Dance* games. *Leatherman Tool Group,* 199 F.3d at 1013 (finding no protectable trade dress where plaintiff failed to provide any evidence or witness testimony that the appearance of the product was driven by aesthetic, rather than practical, considerations).

        b.    **Other Dance Games Use Similar Avatars and Instructors and the Mere Existence of Alternative Designs Is Insufficient to Demonstrate Non-Functionality**

KAYE SCHOLER LLP

Contrary to Ubisoft's assertions, other dance video games use white skin on their avatars, including on their packaging, as well as stick figure instructors. Coats Decl., Exhs. H & I. Moreover, the mere availability of alternative designs is not sufficient to demonstrate that a particular design is nonfunctional; rather, "there must be a sufficient number of alternative designs such that providing trademark protection to one design would not hinder competition." *Disc Golf Ass'n, Inc.*, 158 F.3d at 1008 (citing W.J. McCarthy, McCarthy on Trademarks and Unfair Competition, § 7:75 at 7-156 (4th Ed. 1998)).

In *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, the court found "insufficient evidence to support an inference of commercial viability of alternative designs" where the plaintiff "provided no sales data for alternative designs and no information pertaining to the market share of any particular alternative design." 158 F.3d at 1009; *see also Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1014 (9th Cir. 1999) (rejecting the view that the existence of "*any* alternate design that competes to *any* degree" would be sufficient to suggest a product feature is nonfunctional) (emphasis in original).

Ubisoft likewise fails to provide the requisite evidence. Ubisoft emphasizes the market share enjoyed by the *Just Dance* series of video games as compared with other dance video games. Ubisoft Br. at 5 & 7; Detoc Decl. ¶¶ 3, 5, & 6. However, Ubisoft has not submitted any evidence demonstrating that the avatar and instructional designs used by other dance video games have allowed them to compete effectively with the *Just Dance* series. Rather, Ubisoft's arguments suggest that other dance games have been unable to compete with the *Just Dance* franchise. *Id.*

The examples that Ubisoft cites as evidence of viable alternative designs are pulled from games with distinguishable source material and goals. The *Dancing with the Stars* video game is derived from the popular international television series featuring celebrities and professional dancers, and is a rhythm-based game that does not require full-body instructions; the *Boogie* and *Boogie Superstar* games are aimed at children and pre-teens, and feature very simple moves and cartoonish characters with exaggerated features to suit the skills and tastes, respectively, of the target audience; and the *Dance Dance Revolution* series of games only require players to match

steps, and not full-body movement, so its use of a dance mat with directional arrows is sufficient. In sum, Ubisoft's evidence of alternative designs are inapposite in this case.

### c. Ubisoft's Own Press Releases Advertise the Teaching Function of the *Just Dance* Games

Advertisements that discuss the utilitarian advantages of the allegedly infringed features constitute "strong evidence of functionality." *Disc Golf Ass'n, Inc.*, 158 F.3d at 1009 (citing McCarthy, § 7:74 at 7-152). In press releases issued in 2009, 2010, and 2011, Ubisoft has touted the instructional aspect of its *Just Dance* video games. Coats Decl., Exh. J (noting that "up to four people can break it down at a time, as they follow on-screen choreographed moves set to classic dance tracks," "players will learn real dance moves," and players are encouraged "to mirror the dance choreography featured in the game"). The use of instructors is vital to the purpose of the *Just Dance* games, and, as such, is functional rather than ornamental.

### d. Method of Manufacture

If a design "achieves economies in manufacture or use," it is functional. *Disc Golf Ass'n, Inc.*, 158 F.3d at 1009 (citing *Int'l Jensen*, 4 F.3d at 823) (internal quotation marks omitted). Ubisoft offers no evidence that the avatar and instructor designs were not relatively simple or inexpensive to develop and create.

\* \* \*

The use of white skin is useful for distinguishing the dancer from his or her color-saturated or dark background, and the use of instructors is essential to fulfill the purpose of an instructional dance video game. Allowing Ubisoft to exert a monopoly over these functional features would severely and unjustly inhibit legitimate competition from other publishers of dance video games. *See, e.g.*, *Qualitex Co. v. Jacobson Prods. Co. Inc.*, 514 U.S. 159, 164-65 (1995) (stating that "[t]he functionality doctrine prevents trademark law ... from ... inhibiting legitimate competition by allowing a producer to control a useful product feature" in perpetuity; *see also Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1011-12 (9th Cir. 1999) ("The requirement of nonfunctionality is based 'on the judicial theory that *there exists a*

1  *fundamental right to compete through imitation of a competitor's product....'"*) (internal citation

2  omitted) (emphasis in original).

3         **2.     The Avatars and The Instructors Are Not Distinctive**

4         To be considered protectable trade dress, a design must be "inherently distinctive" or it

5  must have acquired secondary meaning.  *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*,

6  741 F. Supp. 2d 1165, 1176 (C.D. Cal. 2010).  Trade dress is "inherently distinctive" only if its

7  "intrinsic nature serves to identify a particular source."  *Id.*  To determine whether trade dress is

8  so "unique, unusual, or unexpected in this market that one can assume without proof that it will

9  automatically be perceived by consumers as an indicator of origin," the Court can examine

10  several factors, *id.*, which Professor McCarthy has noted can be distilled into one question:

11  whether the alleged trade dress is common or "is of such an unusual design that a buyer will

12  immediately rely on it to differentiate the source of the product."  *See Racetrac Petroleum, Inc. v.*

13  *J.J.'s Fast Stop, Inc.*, 2003 WL 251318, at *16 (N.D. Tex. Feb. 3, 2003) (quoting 1 J. Thomas

14  McCarthy, *McCarthy on Trademarks & Unfair Competition* § 8:13 (4th ed. 2002)).

15         Ubisoft does not provide any evidence that its avatars and instructors are, in fact,

16  "original" and "unique" in the dance video game market.[3]  Instead, Ubisoft just says they are, but

17  Ubisoft's self-serving statement are not a substitute for fact.  The fact is that designs of those

18  features are commonplace in the dance video game industry.  Gamemill's *Country Dance* and

19  Sony's *Eye Toy Groove* feature dancers with white skin prominently on the front of their

20  packaging.  Coats Decl., Exh. H.  *Country Dance*, Sony's *Dancestar Party*, and Harmonix's

21  *Dance Central* use generic stick figure instructors to demonstrate the dance moves.  *Id.*, Exh. I;

22  *see also Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995) ("[J]ust

23  as copyright law does not protect ideas but only their concrete expression, neither does trade dress

24  law protect an idea, a concept, *or a generalized type of appearance*.") (internal citations omitted)

25  (emphasis added).

26

27  [3] Ubisoft likewise offers no evidence whatsoever that the *Just Dance* avatars and instructors have
acquired distinctiveness or secondary meaning.

28

17

60438904_3.DOCX  PLAINTIFFS' OPPOSITION TO UBISOFT'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIONCASE NO. C11-CV-4980 CRB

### 3. There Is No Likelihood of Confusion Between the *Just Dance* Games and *Get Up and Dance*.

Because Ubisoft cannot carry its burden of demonstrating nonfunctionality, this Court has no occasion to reach the third part of the trade dress test, which requires the plaintiff to show that the defendant's product is likely to cause confusion among consumers. The Ninth Circuit has identified eight factors (referred to as the *Sleekcraft* factors) to consider in determining whether such confusion is likely: (1) the similarity of the trade dress, (2) the strength of the trade dress, (3) evidence of actual confusion, (4) the proximity or relatedness of the goods, (5) the degree to which the marketing channels used for the goods converge, (6) the type of goods and degree of care likely to be exercised by the purchasers, (7) the defendant's intent in selecting the trade dress, and (8) the likelihood of expansion of product lines. *See Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)). The importance of each of these factors may vary depending on the context of a particular case. *Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999); *see also Dreamwerks Production Group, Inc.*, 142 F.3d at 1129 ("The factors should not be rigidly weighed; we do not count beans."). As shown above Ubisoft's avatars and instructors in its *Just Dance* games are not protectable trade dress. For completeness, OGI nonetheless shows that application of the *Sleekcraft* factors compels the conclusion that there is no likelihood of confusion between *Just Dance* and *Get Up and Dance*.

### a. The *Just Dance* and *Get Up and Dance* Avatars and Instructors Are Not Similar.

As shown in section III.B.3.b. above, the avatars and instructors in the *Just Dance* games are distinguishable from those in Get Up and Dance in numerous ways, including size, placement and prominence on the screen, appearance of clothing, appearance of facial features, style, and context. Furthermore, Ubisoft's *Just Dance* games and OGI's *Get Up and Dance* game are each "clearly mark[ed] ... with a distinct name" and sold in "distinct packaging." Coats Decl., Exh. B.

The distinctive differences in marking and packaging is fatal to Ubisoft's trade dress infringement claim. *See Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009,

1011-14 (9th Cir. 1999) (ruling defendant's product was marked and packaged distinctively and, thus, did not infringe plaintiff's alleged trade dress); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1384 (9th Cir. 1987) ("[F]or the limited purpose of a preliminary injunction motion, the differences in the labels are sufficient for a finding of no likelihood of confusion.") (*cited in Int'l Jensen, Inc.*, 4 F.3d at 825). The first factor weighs in favor of OGI.[4]

  b.  **Ubisoft's Avatars and Instructors Are Not Protectable Trade Dress**

As discussed above in sections III.C.1 and III.C.2, since Ubisoft's *Just Dance* avatars and instructors are functional and non-distinctive, they are not protectable as trade dress. Thus, the second factor weighs in favor of OGI.

  c.  **Ubisoft's Evidence of Actual Confusion is Not Only De Minimis, But Actually Supports a Finding of Lack of Confusion**

Ubisoft offers nothing beyond a single instance in which a consumer expressed some confusion. Ubisoft thus does nothing to satisfy its burden of demonstrating the likelihood of actual confusion. "Evidence of only a small number of instances of actual confusion can be dismissed as inconsequential or de minimis." 4 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 23:14 (4th ed. 2007); *see also Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200-01 (1st Cir. 1996) ("Just as one tree does not constitute a forest, an isolated instances of confusion does not prove probable confusion. To the contrary, the law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.").

Ubisoft cites to ***one*** instance of potential consumer confusion in support of its claim of trade dress infringement. Chang Decl., Exh. Q. However, Ubisoft rather conveniently chooses to

---

[4] No one factor is determinative. Thus, even if the Court were to find that the two alleged trade dresses were similar, such similarity, without more, would not necessarily create consumer confusion. *See Brookfield Communications, Inc.*, 174 F.3d at 1055.

19

60438904_3.DOCX  PLAINTIFFS' OPPOSITION TO UBISOFT'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIONCASE NO. C11-CV-4980 CRB

turn a blind eye to the *five* comments on the same page that demonstrate that consumers of dance video games are able to distinguish between the *Just Dance* games and *Get Up and Dance*:

Martin Zompicchiatti comments: "Yo guys, the game is looking pretty dope so far!  Looks like finally Just Dance will have some serious competition ;)"; Rafael Calomeno says: "Just Dance will have to run for my money ;)"; Juliet Short says: "No its better than just dance its GET UP AND DANCE xxx"; Lemar Alden says: "I really like this game and the dance moves are way better than just dance, but i dont like how they put the music video in the backround... anyway im gonna get both games : D!"; and Rhiana Mckenzie says: "Not BETER than just dance, but its getting there xx."  Chang Decl., Exh. Q.  Ubisoft has failed to demonstrate actual consumer confusion and, in fact, the evidence on which it relies clearly demonstrates that reasonably prudent purchasers exercising ordinary care will ***not*** confuse the two games.  Thus, third and sixth factors weigh in OGI's favor.

### d.     **OGI Independently Created the *Get Up and Dance* Game**

To be sure, "[k]nowing adoption of a mark that is closely similar to one that is used by another is a basis for inferring intent to deceive the public," *Fiji Water Co., LLC*, 741 F. Supp. 2d at 1081, but, here, OGI did not adopt designs that are similar to Ubisoft's alleged trade dress, *see supra* sections III.B.3.b. and III.C.3.a., much less knowingly do so.  OGI had no intent to copy, and did not copy, Ubisoft's claimed elements.  OGI independently developed its *Get Up and Dance* video game, and the elements contained therein, including the avatars and instructors, after careful consideration of the purpose of the game and the most effective and efficient means of conveying the images and instructions to the user.  *See supra* Section II.B.

\*         \*         \*

Taken together,[5] the likelihood of confusion factors weigh in favor of OG.  There is no likelihood of confusion between the avatars and instructors in the *Just Dance* and *Get Up and Dance* video games.

---

[5] The fourth and fifth *Sleekcraft* factors are neutral or weigh in OGI's favor.  That both products are dance video games meant for use on the same or similar video game consoles does not weigh in Ubisoft's favor in light of the fact that, as discussed above in section III.C.2., the avatars and

(continued...)

### D.    Ubisoft Has Not Established the Potential for "Irreparable Harm"

The Ninth Circuit recently confirmed that there can be no presumption of irreparable harm for purposes of injunctive relief in copyright cases. *Flexible Lifeline v. Precision Lift*, No. 10-35987, 2011 WL 3659315, at \*9 (9th Cir. Aug. 22, 2011) (vacating injunction). Rather, the party seeking a TRO and preliminary injunction must establish, at minimum, a "significant threat of irreparable injury." *Cal. Apartment Association v. San Diego County Apartment Association, Inc.,* No. 11cv300-WQH-RBB, 2011 WL 1002667, at \*2 (S.D. Cal. March 18, 2011) (internal citations omitted) (the "possibility" of irreparable harm is not enough to support injunctive relief). The movant must produce probative evidence of the injury, and injunctive relief should be denied where the allegations are speculative, unsupported, or accompanied by conclusory affidavits. *Bell Atlantic Bus. Sys., Inc. v. Storage Tech. Corp.*, No. C-94-0235 MHP, 1994 WL 125173 at \*2-4 (N.D. Cal. March 31, 1994); *Leatt Corp. v. Innovative Safety Tech., LLC*, No. 09-cv-13-1-LEG,2010 WL 1526382, at \*10 (S.D. Cal. April 15, 2010).

Ubisoft speculates that a preliminary injunction is necessary because it will otherwise suffer irreparable injury in the form of price erosion and lost sales/customers leading to decreased "franchise loyalty," "brand momentum," and "brand consistency."[6] Ubisoft offers no supporting evidence, and instead merely argues that it cannot quantify or calculate the impact to its business. Ubisoft's failure to offer probative evidence that it will sustain immediate and real irreparable

---

instructors used are commonplace in dance video games and there are numerous such games on the market such that consumers are accustomed to distinguishing between them. *See Miss World (UK), Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988) (holding that where there are many similar marks, consumers learn to carefully pick out one from the other). The eighth factor is not relevant in this case.

[6] Ubisoft cites language from a 7Bit Arcade review to support its claim of irreparable harm, inserting "Just Dance" into the snippet quoted: "the knife in the [just dance] franchise before it even shows its face." Mot. at 2, Br. at 2 (citation omitted). When read in full, however, it is clear that the reviewer is referring to OGI's *Get Up and Dance* suffering the death knell before it even reaches the market: "As a veteran of dancing games (I took on a self proclaimed DDR superstar at London's Trocadero and beat them), I was looking forward to putting this new franchise through its paces. GUAD seems to be a direct competitor to the behemoth that is Ubisoft's Just Dance series, a fact that can either be a positive in sheep's clothing or the knife in the franchise before it even shows its face." http://7bitarcade.com/feature-post/get-up-and-dance-preview/.

21

60438904_3.DOCX  PLAINTIFFS' OPPOSITION TO UBISOFT'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIONCASE NO. C11-CV-4980 CRB

injury is fatal to its motion. Moreover, courts within this Circuit, including this Court, have rejected the argument that lost sales, lost customers and/or lost goodwill constitute irreparable harm. *See*, *e.g.*, *Bell Atlantic*, 1994 WL 125173 at *3 ("Although a loss of customers and a resulting loss in revenue surely make it more difficult to compete, they do not amount to irreparable harm because such injuries are measurable and thus have an adequate remedy at law. Indeed, in *American Passage Media Corp.*, the Ninth Circuit held that it would be improper for a trial court to base a finding of irreparable harm to competition on a loss of customers unless the moving party was being forced out of business) (citations omitted); *Kerr Corp. v. N. Am. Dental Wholesalers, Inc.*, 2011 WL 2269991, at *4 (C.D. Cal. June 9, 2011) ("[l]ost sales (without more) are presumed to be compensable through damages"); *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("Purely monetary injuries are not normally considered irreparable."); *TMX Funding, Inc. v. Impero Techs., Inc.*, No. C10-00202 JF (PVT), 2010 WL 1028254, at *8 (N.D. Cal. March 18, 2010) ("The fact that the alleged harm is primarily in the form of lost customers and business goodwill, which at least in theory may be compensated by damages, weighs against TMX's claim of irreparable harm.").

Ubisoft's claims of price erosion likewise misses the mark. Courts have held that price erosion is not irreparable harm. *See, e.g., Presidio Components Inc. v. Am. Tech. Ceramics Corp.*, 723 F. Supp. 2d 1284, 1338 (S.D. Cal. April 13, 2010) ("loss of market share and price erosion are economic harms and are compensable by money damages") (citations omitted); *Novartis Pharmaceuticals Corp. v. Teva Pharmaceuticals USA, Inc.*, No. 05-CV-1887 (DMC), 2007 WL 2669338, at *14 (D. N.J. Dept. 6, 2007). Moreover, Ubisoft's price erosion theory wholly depends on *Just Dance* selling for $39.99, above *Get Up and Dance*'s $29.99 price. In actuality, *Just Dance* is available at major retailers such as Walmart and Amazon for prices that are *lower* than $29.99. Further, there are numerous other competing dance video games that sell at such lower prices. Coats Decl. Ex. 3. Thus, Ubisoft's price erosion claims are fictitious, as well as legally irrelevant.

**E.    The Granting of a Preliminary Injunction Would Substantially and Disproportionally Harm OGI**

When considering a request for a TRO or preliminary injunction, courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987). Here, OGI would be disproportionately harmed if a TRO/preliminary injunction were to be granted.

OGI is a relatively recent entrant to the U.S. video game market. In fact, OGI's best-selling game to date in the U.S. accounted for sales of a mere 78,000 units. Scott Decl. ¶ 6. Ubisoft, on the other hand, is a behemoth in the U.S. In fact, Ubisoft is the third-largest videogame publisher in North America, and boasts the second-largest in-house video game development staff in the world. Ubisoft Br. at 3. Importantly, the *Just Dance* franchise constitutes only a fraction of the arsenal of videogames that Ubisoft sells. Ubisoft has already established a strong presence in this country, and has a vice-like grip on the market for dance videogames. Thus, Ubisoft's argument that the denial of a restraining order -- which would allow a far smaller company to enter the dance-game market -- would significantly harm Ubisoft, is weak at best.

More to the point, if a preliminary injunction is granted, OGI will lose prospective significant sales and customers, and coincidentally, the ability to gain a foothold in the market for instructional-based dance game videos. OGI's *Get Up and Dance* is the first offering in OGI's dance game video line, and barring OGI from this product launch will devastate and permanently impair OGI's entry into this market, particularly given the timing of Ubisoft's motion. *Get Up and Dance* is set to be released on November 8, just as the Christmas shopping season will be ramping up. If an injunction is entered, OGI will be prevented from releasing its highly-anticipated product at a critical time of the year, when consumer shopping will reach its peak. Scott Decl. ¶¶ 27 & 28. This will result not only in OGI losing countless sales, but will also deal a potentially fatal blow to OGI's relationship with its U.S. customers, who are relying on the November 8th product release.[7] Thus, while Ubisoft speculates that it will lose sales and market

---

[7] The 7Bit Arcade review Ubisoft cites to repeatedly says as much. *See supra* Opp. at ___, n.6.

KAYE SCHOLER LLP

share in the absence of a restraining order, there is no doubt that OGI will lose significant sales and revenue should an injunction be ordered.

Furthermore, Ubisoft has almost certainly been aware of *Get Up and Dance* since June of 2011, when the game was announced at the Electronic Entertainment Expo (E3), an annual videogame conference held at the Los Angeles Convention Center. Coats Decl. Ex. C; Scott Decl. ¶ 26. Moreover, immediately following the convention, articles concerning *Get Up and Dance* flooded the Internet. *Id.* Ex. C. Therefore, it is unfathomable that one of the biggest players in the industry would have been unaware of the game following its announcement. Nevertheless, Ubisoft chose to wait until the eve of the release of *Get Up and Dance* to move for a temporary restraining order. The harm to Ubisoft cannot be what it alleges, or it would have acted far sooner. Instead, Ubisoft's goal is clear: to disrupt OGI's ability to market its game during the rapidly approaching holiday season.

**F.    A TRO and Preliminary Injunction is Not in the Public Interest**

Ubisoft's entire public interest argument rests on its assertion that public policy favors protecting copyright and trade dress. Ubisoft Br. at 23-24. This is only true, however, after infringement has been *conclusively* established and a *permanent* injunction is sought. Indeed, "public policy does not advocate the liberal issuance of *preliminary* injunctions" in intellectual property cases. *See Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1038 (9th Cir. 1994) (rejecting argument that public interest favored a preliminary injunction where device manufacturer was wrongfully enjoined from selling video game device and suffered $15 million in damages).

Moreover, public policy favors competition, especially where a preliminary injunction would devastate a small company and reduce the number of options for consumers. *See SRI Int'l. v. Acoustic Imaging Techs. Corp.*, No. C–92–5015–VRW, 1993 WL 356896, at *4 (N.D. Cal. Sept. 3, 1993) ("[P]ublic interest is also served by promoting competition . . . . To jeopardize the existence of a company by the issuance of a preliminary injunction, where, as here, there are serious questions about the validity of the patent and where there is no irreparable harm, is plainly contrary to public policy.").

**IV.    CONCLUSION**

For the foregoing reasons, the Court should deny Ubisoft's motion for a TRO and preliminary injunction.

October 17, 2011                                KAYE SCHOLER LLP


_____/s/ William Sloan Coats_____

Attorneys for Plaintiffs OG International and O-Games USA

25

60438904_3.DOCX   PLAINTIFFS' OPPOSITION TO UBISOFT'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIONCASE NO. C11-CV-4980 CRB