IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OG INTERNATIONAL, LTD. ET AL, <br><br> Plaintiffs, <br><br> v. <br><br> UBISOFT ENTERTAINMENT ET AL, <br><br> Defendants. | No. C 11-04980 CRB <br><br> **ORDER DENYING TRO AND PRELIMINARY INJUNCTION** |

This is a dispute between two video game manufacturers. Ubisoft Entertainment S.A. ("Ubisoft") created and distributes the Just Dance series of dance-based video games (Just Dance, Just Dance 2, Just Dance 3). Competitor OG International ("OG") has announced the release of a competing dance-based video game, Get Up and Dance. While OG originally filed this action requesting declaratory relief, dkt. 1, Ubisoft has now filed a motion for TRO and Preliminary Injunction requesting the court enjoin the release of Get Up and Dance prior to its scheduled release on November 1, 2011.[1] Dkt. 13.

Ubisoft claims OG has violated its copyrights and trade dress in Just Dance by copying unique protectable expression in the game, specifically in two key visual elements that Ubisoft argues distinguish the Just Dance series from other dance-based video games on the market – the "avatar" and "instructor" elements. The "avatar" is the central dancing

---

[1] It appears there is a dispute over the release date. OG states in its Opposition the product release is scheduled for November 8, 2011. Opp'n at 23.

figure that represents the player, and the "instructor" relays the Just Dance moves to the player.

The Court held a hearing on October 24, 2011. Since the Court does not find Ubisoft has satisfied the four elements required to grant injunctive relief, the Court DENIES the motion for a temporary restraining order and preliminary injunction.

## I.  FACTUAL BACKGROUND

Ubisoft is the third largest independent video game publisher in the U.S. and has sold hundreds of millions of video games in its portfolio of 20 different franchises during its 25-year history. Declaration of Andrew Chang in support of Motion for Preliminary Injunction ("Chang Decl.") (dkt. 15) Exs. A, B. Ubisoft's portfolio includes a variety of dance video games, including Dance on Broadway, Michael Jackson Experience, Smurfs Dance Party, and the Just Dance series. Declaration of William Sloan Coats in support of Plaintiff's Opposition to Motion for Preliminary Injunction ("Coats Decl.") (dkt. 25) Ex. F. Ubisoft's Just Dance games have been sold since 2009. Chang Decl. Ex. D ¶ 2.

OG is a recent entrant to the U.S. Video game market. Collectively, OG International Ltd. and its U.S. subsidiary O-Games Inc. have a total of nine employees. Declaration of James Scott in support of Opposition to Motion for Preliminary Injunction ("Scott Decl.") ¶ 4. OG's best-selling games, My Make-Up, has had limited sales (78,000 units), and OG does not have any direct accounts at any of the major video game retail chains. Scott Decl. ¶ 5. OG states it decided to create a franchise focused on dancing and singing video games in December 2010, recognizing the popularity of dancing, fitness, and singing video games. Scott Decl. ¶ 17. It ultimately chose to launch separate products focused on those activities: Get Up and Dance and Get Up and Sing. Id. OG states the unique feature of Get Up and Dance is that the background is comprised of official music videos, a core concept of the game not found in any other dance video game on the market. Id.

In the dance game genre, there are mainly three different types of dance video game sub-genres: (a) rhythm-based games, (b) dance mat games, and (c) instructional-based games. Scott Decl. ¶ 8. Rhythm-based games require the player to press a sequence of

buttons or move the controller in a basic sequence of moves (left, right, up, down, shake, etc.), usually in time to the music. Id. ¶ 9. These basic moves are rhythmical reactions by the player rather than dance moves. Id.[2] Dance mat games can only be played with a dance mat, which lies on the floor and has 8 direction pads, such as Dance Dance Revolution. Id. ¶ 10. The player receives a set of sequences/moves, which correspond to specific symbols in different sections of the dance mat and the player must move her feet and press down on the correct pads, in the correct sequence. Id. The player does not copy or follow the avatar.

Just Dance and Get Up and Dance are instructional-based dance games. Such games include a main dancer avatar whose dance moves are followed and imitated by the player. Scott Decl. ¶ 11. These types of games are normally developed with real choreographies performed by real dancers. Id. The dancers are either filmed separately and then modeled into the game, or they are motion-captured and then made into character models which are modeled into the game. Id.

The type of dance game sub-genre dictates what type of characters can be used in the game: (a) animated characters, (b) motion-captured characters, and (c) characters derived from choreographed dancers. Both Just Dance and Get Up and Dance use characters derived from choreographed dancers, as do many of the other instructional-based dance games. Id. ¶¶ 14-15 & Ex. A.

In early 2011, OG hired video game developer, Gusto Games, to create the Get Up and Dance game. Declaration of Mark Mainey in support of Opposition to Motion for Preliminary Injunction ("Mainey Decl.") (dkt. 27) ¶ 5. Since OG wanted music videos in the background, the dancers in the game needed to appear more realistic in the fluidity of their moments and thus, Gusto Games decided to film live dancers against a green screen instead of using motion capture technology. Id. ¶ 6; Scott Decl. ¶ 20. During testing and the filming process, Gusto realized the dancers needed to wear heavy white make-up in order to mitigate shadows on their faces, as well as perspiration resulting from the bright lights illuminating

---

[2] Examples of rhythm-based games include Boogie, Dancing With the Stars, and Dance Sensation. Scott Decl. ¶ 9.

3

the performance, in order to create the desired flat visual style. Mainey Decl. ¶¶ 12-16. OG and Gusto state they ultimately decided to proceed with white skin on the dancers in order to create a more striking contrast against the rest of the cements of the game: (1) the background for the dancers was already black; (2) the music videos included a myriad of colors against which white would stand out more; and (3) OG wanted to be able to have the dancers wear black clothing, a common clothing color choice in music videos. Mainey Decl. ¶ 19; Scott Decl. ¶ 21.

Get Up and Dance was announced at the Electronic Entertainment Expo (E3), an annual video game conference held at the Los Angeles Convention Center in June 2011. Coats Decl. Ex. C; Scott Decl. ¶ 26. Following the convention, articles on the new game appeared on internet gaming sites. Coats Decl. Ex. C. In August 2011, Ubisoft began corresponding with OG regarding its claims of copyright and trade dress infringement. Answer and Counterclaims at 3, ¶ 2. Ubisoft stated it would file suit no later than October 11, 2011. Id. at ¶ 3. OG then filed suit for declaratory judgment on October 7, 2011. Ubisoft then filed this motion for temporary restraining order and preliminary injunction.

## II.   LEGAL STANDARD

The standard for issuing a preliminary injunction is well established, and mirrors that for a temporary restraining order. Stuhlberg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001). "[I]njunctive relieve [is] an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief." Winter v. Natural Res. Defense Council, Inc., 555 U.S. 7, 22 (2008). The party seeking relief must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent relief; (3) the balance of equities tips in its favor; and (4) the requested relief is in the public interest. Id. at 20. Under the Ninth Circuit's "sliding scale" approach, the first and third elements can be balanced such that "serious questions" going to the merits and a balance of hardships that "tips sharply" towards the movant is sufficient so long as the other two elements are met. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

1    Copyright infringement requires showing that (1) movant owns copyrights and (2)
2 respondent has created an authorized copy. Data East USA, Inc. v. Epyx, Inc., 862 F.2d 204,
3 206 (9th Cir. 1988). Proof of copying requires showing (1) access to the protected work
4 before creating the accused work and (2) that a substantial similarity of expression exists
5 between the protected and accused works. Narell v. Freeman, 872 F.2d 907, 910 (9th Cir.
6 1989). The Ninth Circuit applies a two-part test to assess similarity, an "extrinsic" inquiry to
7 determine whether the similar elements between the works are protectable, and an "intrinsic"
8 inquiry to determine whether an ordinary reasonable observer would consider the
9 copyrighted and challenged works substantially similar. Mattel, Inc. v. MGA Entm't, Inc.,
10 616 F.3d 904, 913-14 (9th Cir. 2010).

11    Trade dress "refers to the 'total image of a product' and may include features such as
12 size, shape, color, color combinations, texture or graphics." Int'l Jensen, Inc. v. Metrosound
13 U.S.A., Inc., 4 F.3d 819, 822 (9th Cir. 1993). A plaintiff may recover for trade dress
14 infringement if the trade dress is both nonfunctional and distinctive, and if there is a
15 likelihood that the public would confuse the alleged infringer's trade dress with that of the
16 plaintiff. Id. at 823. The Ninth Circuit considers four factors to assess functionality: "(1)
17 whether the design yields a utilitarian advantage, (2) whether alternative designs are
18 available, (3) whether advertising touts the utilitarian advantages of the design, and (4)
19 whether the particular design results from a comparatively simple or inexpensive method of
20 manufacture." Disc Golf Ass'n v. Champion Discs, 158 F.3d 1002, 1006 (9th Cir. 1998).
21 Courts may consider the following relevant factors to assess the inherent distinctiveness of
22 the trade dress: (1) whether the design is a common, basic shape or design and (2) whether it
23 was unique or unusual in a particular field. Fiji Water Co., F. Supp. 2d at 1176.

24    Courts may consider eight Sleekcraft factors in assessing likelihood of confusion: (1)
25 similarity of the conflicting designations; (2) relatedness or proximity of the two companies'
26 products or services; (3) strength of trade dress; (4) marketing channels used; (5) degree of
27 care likely to be exercised by purchasers in selecting goods; (6) OG's intent in selecting its
28

5

1 designation; (7) evidence of actual confusion; and (8) likelihood of expansion in product
2 lines. Interstellar Starship Servs. v. Epix, Inc., 184 F.3d 1107, 1110 (9th Cir. 1999).

## III. DISCUSSION

Ubisoft has failed to make a clear showing that it is entitled to such extraordinary relief. While its claims are not implausible, it is has not demonstrated a clear likelihood of success on the merits, nor a clear showing of irreparable harm. Moreover, the balance of the hardships do not clearly favor Ubisoft, thus even serious questions on the merits are not sufficient to grant injunctive relief.

### A. Likelihood of Success on the Merits

#### 1. Copyright Infringement Claim

Ubisoft appears to own the copyrights in the Just Dance series of games, as they were created by its employees as "works for hire" and it has registered the copyrights in Just Dance and Just Dance 2 (though not, it appears, in Just Dance 3, which was released recently). 17 U.S.C. § 101, 201(b); Chang Decl. Ex. K.

Proof of copying requires a showing (1) that OG had access to the protected work before creating the accused work and (2) that a substantial similarity of expression exists between the protected and accused works. Narell v. Freeman, 872 F.2d 907, 910 (9th Cir. 1989). Access to Just Dance series existed because the works were widely distributed. Three Boys Music Corp. v. Bolton, 212 F.3d 477, 482 (9th Cir. 2000). OG does not concede a high degree of access. Opp'n at 8 n.2.

The Ninth Circuit applies a two-part test to assess to "distinguish between permissible lifting of ideas and impermissible copying of expression." Mattel, Inc v. MGA Entm't, Inc., 616 F.3d 904, 913 (9th Cir. 2010). The test includes an "extrinsic" inquiry to determine whether elements between the works are protectable, and an "intrinsic" inquiry to determine whether an ordinary reasonable observer would consider the copyrighted and challenged works substantially similar. Id. at 913-14. The starting point is to determine the breadth of possible expression, and if there is a wide range of possible expression, "a work will infringe if it's substantially similar to the copyrighted work." Id. If there is a narrow range of

6

possible expression, then copyright protection is thin and a work must be virtually identical to infringe. Id.

### a. Extrinsic Inquiry

Ubisoft argues the "avatar" and "instructor" elements of its games are unique expressions of the avatar and instructor ideas that are entitled to broad protections because there is a wide range of possible expressions for those general ideas. See Mattell, 616 F.3d at 913-14. OG counters that there is only a narrow range of expression of avatars and instructors in an instructional-based dance video game, and thus, the "virtually identical" standard should apply. Alternatively, OG argues Ubisoft fails to demonstrate the avatars and instructors meet the substantial similarity standard as well.

Ubisoft compares its unique expression of the avatar and instructor ideas to the case of the "gobbler" and "ghost monsters" in the PAC-MAN game, which were found to be protectable elements of expression entitled to broad protection. Atari, Inc. v. North American Philips Consumer Electronics Corp., 672 F.2d 607, 616-620 (7th Cir. 1982). In Atari, the Court held that general elements such as a maze, scoring table, tunnel exits, were standard game devised only protected from identical copying, but the unique expressions of PAC-MAN like the "gobbler" pursuing "ghost monsters" were entitled to broad protection. Ubisoft argues Atari applies here, in that competing video games in the dance genre (other than Get Up and Dance) have used several different ways to express the "avatar" and "instructor" elements, and thus, they should be given broad protection.

OG argues that the white-skinned, brightly clothed avatars and stick-figure instructors are not protectable expressions of ideas, but rather features that necessarily flow from the idea of an instructional-based dance video game. OG argues the type of avatar depends heavily on the type of dance game because in instructional-based games the avatars are usually based on real-life choreographed human dancers, in contrast to other types of games. OG argues the situation here is similar to that in Data East USA, Inc. v. Epyx, Inc., 862 F.2d 204, 206 (9th Cir. 1988), rather than Atari. In Data East, the Ninth Circuit held that generic features that necessarily followed from the idea of a karate combat video game and that were

standard treatment of the karate sport – such as common moves of the sport, the manner of scoring, limitations upon the use of color in one visual image, and the use of special techniques for creating mobile graphic computer images – are not protectable under copyright law. 862 F.2d at 209. OG argues the realistic depiction of dance in the instructional-based dance video game context is subject to certain constraints that dictate the use of elements common to such games. For example, the use of avatars with white skin and bright clothing to stand out against a background so as to be readily followed by the player, and the use of stick figures to demonstrate upcoming dance moves, are common features of such games.

  OG also argues <u>Atari</u> is inapplicable because Pac-man featured monsters and other creatures of fantasy. OG argues there are countless ways to express fanciful monsters, countless ways to express monsters' movements, and countless ways for a player to earn points based on monster chases. Yet, there are only a limited number of ways to express dancers dancing in a non-animated, instructional-based dance video game. Like karate, OG argues, dance is "not susceptible to a wholly fanciful presentation." <u>Data East</u>, 862 F.2d at 209. Ubisoft responds that the features at issue in <u>Data East</u> were not aesthetic design choices but rather were necessary aspects of karate games, <u>id.</u>, and thus not analogous to the avatars and instructors at issue here.

  OG also argues the Ubisoft cannot copyright white skin and brightly colored clothing of the avatars. OG argues the use of one color versus another is inherently uncopyrightable. 37 C.F.R. § 202.1 ("[E]xamples of works not subject to copyright [include] . . . mere variations of . . . color"); <u>see also</u> <u>Pasillas v. McDonald's Corp.</u>, 927 F.2d 440, 443 (9th Cir. 1991) (finding use of a white color to depict the man on the moon was not a protected element because it was a commonly used color for man on the moon drawings). OG also argues the use of bright colors to present a product in a fun and whimsical light is not copyrightable expression. See <u>Excelligence Learning Corp. v. Oriental Trading Co., Inc.</u>, 2004 WL 2944048, at *12 (N.D. Cal. Dec. 20, 2004) (finding, in the context of catalogs, that a company does not have a copyright in featuring the use of whimsy and bright colors).

8

Ubisoft argues that it is not attempting to copyright the color white or bright colors for clothing individually, but rather as expressive element parts of its avatars. Reply at 4-5. It argues OG is improperly defining the "idea" versus "expression" element too narrowly in an attempt to cast the use of white and bright colors as an idea, rather than an element of the expression of the idea of an avatar. See Midway Mfg. Co. v. Bandai-America, Inc., 546 F. Supp. 125 (D.N.J. 1982) ("[A] copyright defendant could always avoid liability merely by describing a plaintiff's work in great detail and then labeling that description the 'idea' of plaintiff's work.").

Neither of the main cases is exactly on point, at least with respect to the avatars. While the avatars are not as limited in scope as certain set karate moves, they are also not susceptible to the endless variety possible in depicting ghosts or monsters given the technical constraints and requirements of the game. While the avatars are not susceptible to the endless variety possible for elements that are wholly fanciful, the Court finds preliminarily that the avatars are entitled to broader protections, and thus only need to be substantially similar.

The instructors are another matter. First, OG argues Ubisoft cannot copyright the use of stick figures as instructors. Opp'n at 7, citing Blehm v. Jacobs, No. 09-2865, 2011 WL 4369051 (D. Colo. Sept. 19, 2011). In Blehm, the Court held "[s]tick figures are by definition simple." Id. at *5, citing Universal Athletic Sales Co. v. Salkeld, 511 F.2d 904, (3d Cir. 1975) (stating that the use of stick figures involves only "minimal amount of creativity"). In addition, similarities resulting from common themes and general concepts such as the idea of a person skateboarding, playing frisbee, or holding his hand in a peace sign are excluded from protection, as are poses to the extent such poses are suggested by the activities themselves. Id. Thus, while OG's argument that any claim of infringement based on stick figures fails as a matter of law is an overstatement, given the simple nature of the shapes, the fact that there are a limited range of possible dance movements, and that the poses of the instructors are suggested by the activities themselves, the Court finds the instructors are entitled only to very thin protection. This is underscored by the fact that

9

1  several of the other instructional-based dance video games use very similar stick-figure type
2  instructors.  See Coats Decl. Ex. I (screen shots from Dancestar Party, Country Dance, and
3  Dance Central using very similar stick figure instructors).  The examples Ubisoft points to
4  that do not use very similar stick figures are from other types of dance genres, and thus, not
5  relevant.

### b. Intrinsic Inquiry

In the intrinsic test the Court focuses on the key protectable elements (here avatars) to determine whether an ordinary reasonable observer would consider the copyrighted and challenged works substantially similar or virtually identical. Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1476 (9th Cir. 1992). Ubisoft argues Get Up and Dance is substantially similar because both works include avatars that are partially silhouetted stylized dancers with white skin and bright clothing and virtually identical stick figure instructors. Mot. at 15. Ubisoft argues that in comparison to the way avatars are depicted in other, competing games, demonstrates how similar OG's use of the partially silhouetted, white-skinned, and brightly clothed avatars are to the Just Dance avatars. See Mot. at 13 (pictures of avatars from three other dance video games); Mot. at 15 (comparison pictures of Just Dance and Get Up and Dance avatars and instructors).

### i. Avatars

OG responds that there are substantial differences in the avatars, particularly when viewed in context of entire screen shot of the two games. See Opp'n at 10-11 (comparison of two full screen shots); Coats Decl. Ex. A. OG provides a chart of what it characterizes as the "key differences" between the avatars: including size, prominence on screen, bright versus flat color, ombre versus constant color, use of black, facial features washed out or emphasized, "fun" versus "sophisticated" look, and standard background versus official music video background. Opp'n at 11. Thus, OG argues that based on the many enumerated differences the avatars are not substantially similar. While some of these characteristics are tangential to the issue, others are compelling. The Court finds the avatars are not substantially similar because: the size and prominence, and thus, the overall appearances are

different; the color choices and flat versus ombre use of colors are different; the use of facial features instead of washed out features are different; and the heavy use of black is different. See Coats Decl. Ex. A. It is true that the avatars do have some elements in common, and perhaps more elements in common than some of the other games, but Ubisoft has not clearly demonstrated a likelihood that they are substantially similar – particularly given the functional reasons for some of the choices, such as the use of white skin. See Scott Decl. ¶ 21.

### ii. Instructors

OG argues its instructors are not virtually identical to Ubisoft's instructors because they are pale, flatly colored, and placed along the left side of the screen. Opp'n at 11. In contrast, the Just Dance instructors are outlined in neon/glowing white and placed along the bottom of the screen. Id. Given that the stick-figure instructors are entitled only to thin protection, that other similar games use very similar instructors, and that they are not virtually identical, there is not a likelihood of success on the claim of infringement with regard to the instructors.

### iii. Independent Creation

Finally, OG argues its independent creation of the avatars and instructors is a complete defense to any alleged infringement. Blehm, 2011 WL 4369051, at *2 ("Independent creation is a complete defense to a claim of copyright infringement."), citing Whelan Assocs. v. Jaslow Dental Lab, Inc., 797 F.2d 1222, 1228 n.7 (3d Cir. 1986). OG argues it independently developed the avatars and instructors in accordance with the developers' unique vision and desired core concepts for the game. Opp'n at 12; Scott Decl. ¶¶ 11-22. Ubisoft challenges this contention as not supported by anything but "rote denials" and irrelevant facts. Reply at 2-3. As the Court finds that there is not a clear likelihood that the elements are substantially similar or virtually identical, it need not reach the merits of this issue at this time. At the least though, it appears OG provides a reasonable explanation of independent creation that would undermine the likelihood of success on the merits of this claim.

11

Thus, given the above, the Court finds Ubisoft has not demonstrated a likelihood of success on the merits on the copyright claim sufficient to support a preliminary injunction.

### 2. Trade Dress Claim

Trade dress "refers to the 'total image of a product' and may include features such as size, shape, color, color combinations, texture or graphics." Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 822 (9th Cir. 1993). A plaintiff may recover for trade dress infringement if the trade dress is both nonfunctional and distinctive, and if there is a likelihood that the public would confuse the alleged infringer's trade dress with that of the plaintiff. Id. at 823. Ubisoft argues its trade dress (the expression of avatars and instructors) is nonfunctional because it is not essential to the use or purpose of the games. TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 32 (2001).

The Ninth Circuit considers four factors to assess functionality: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." Disc Golf Ass'n v. Champion Discs, 158 F.3d 1002, 1006 (9th Cir. 1998). Ubisoft argues the avatars and instructors are nonfunctional because the particular expression of the characters provide no utilitarian advantage as they serve no purpose beyond identifying the games as part of the Just Dance franchise, nor does Ubisoft tout any such advantage (factors 1 and 3). See Fiji water Co., LLC v. Fiji Mineral Water USA, LLC, 741 F. Supp. 2d 1165, 1173 (C.D. Cal. 2010) (utilitarian advantage based on aesthetic elements where consumer driven to purchase product based on how it looks). As to the second element, Ubisoft argues the other games on the market demonstrate alternative designs are available. Finally, Ubisoft argues the technology used to create the visual elements should differ little in expense from many alternatives currently on the market.

OG responds that the expressions of the avatars and instructors are functional. First, OG argues the use of white skin on the avatars and instructors provides a utilitarian advantage in terms of visibility and in the filming process. Opp'n 13-14. "A product feature

12

need only have some utilitarian advantage to be considered functional." Disc Golf Ass'n, Inc., 158 F.3d at 1007. OG argues the white skin of the avatars serves a functional purpose and provides Just Dance with a utilitarian advantage because white skin stands out from the typically dark backgrounds of dance games that are broken up by pops of color or bright, color-saturated backgrounds. Coats Decl. Ex. G. OG states it chose white skin for this very functional, utilitarian reason. Mainey Decl. ¶ 18; Scott Decl. ¶ 21. In addition, color may be functional, particularly when there is a limited range of available colors to use in the first place, as there is here when depicting skin tone. See First Brands Corp. v. red Meyer, Inc., 809 F.2d 1378, 1382 (9th Cir. 1987). Ubisoft responds that since other games have achieved success without this element, it is not functional. Reply at 8. Since features only need some utilitarian advantage, and the white skin does provide some advantage, the Court finds the expression element of the avatars functional.

As for the instructors, OG argues they provide a utilitarian advantage because thy provide step-by-step moves to users seeking to learn the dances, and allow users to see how and when they need to move each part of their body. The Court finds the instructors are functional, particularly since the other instructional dance video games that are most similar to the two at issue here mostly use stick figure instructors to demonstrate how the user should move each part of their body. Coats Decl. Ex. I.

In addition, the examples of viable alternative designs Ubisoft points to come in part from games with distinguishable source material and goals. For example, some of the games are rhythm-based games, or games aimed at small children, or dance-mat games. In addition, Ubisoft does not provide evidence demonstrating that the avatar and instruction design used by other dance video games have allowed them to compete effectively with Just Dance. See Disc Golf Ass'n, 158 F.3d at 1009. The existence of some alternative designs does not demonstrate the design is non-functional, particularly when the great majority of similar games use virtually identical instructors.

OG argues Ubisoft touts the utilitarian advantage of the instructors because it states the games will allow users to "follow on-screen choreographed moves" and other statements

13

that rely upon the use of the instructor design element. Finally, OG argues Ubisoft has not demonstrated that the avatar and instructor designs were not simpler or more inexpensive to create than alternative designs. The Court finds the elements are functional. Since the elements are functional, it is not necessary to examine the other elements of a trade dress claim, distinctiveness and likelihood of confusion. Thus, the Court finds Ubisoft is not likely to succeed on the merits of the trade dress claim.

### B.     Irreparable Harm

Ubisoft argues it will suffer irreparable harm from the release of Get Up and Dance because of the market dynamics and franchise status of Just Dance. Market dynamics in the video game industry are driven in part by game bestseller lists, which are often reviewed by new customers looking to purchase a game. Chang Decl. Ex D ¶ 14. For example, when existing franchise customers buy Just Dance 3, it will trend toward the top of various game bestseller lists, which a new customer turns to in deciding what game to buy. Id. Thus, Ubisoft argues that every sale of Get Up and Dance that would have gone to Just Dance negatively impacts Just Dance's market momentum and associated ability to attract new customers to the franchise, and thus, the loss of new customers has a greater impact than the loss of the sale of one game. Id. Ubisoft argues this is exacerbated by the franchise status of Just Dance because customers who buy one game from the series often return to buy other existing and/or future games in the series. Id. ¶ 15. For example, with the release of Just Dance 3, the other two titles have resurged in parallel into the top 15 best selling Wii games. Chang Decl. Ex. J. Thus, Ubisoft argues it is not possible to calculate the true extent of damages from the loss of a sale.

In addition, Ubisoft argues that the fact that Get Up and Dance will be sold for $10 less than the Just Dance series and may thus pull customers away because it is cheaper is an incalculable harm and threatens price erosion. See Mint, Inc. v. Iddi Amad, No. 10-9395, 2011 WL 1792570 (S.D.N.Y. May 9, 2011) (enjoining copyright infringement, in part, because price erosion constituted irreparable harm).

14

There is no presumption of irreparable harm for purposes of injunctive relief in copyright cases. Flexible Lifeline v. Precision Lift, No. 10-35987, 2011 WL 3659315, at *9 (9th Cir. Aug. 22, 2011). The party seeking a preliminary injunction must establish "a significant threat of irreparable injury." Cal. Apartment Ass'n v. San Diego County Apartment Ass'n, Inc., No. 11-300, 2011 WL 1002667, at *2 (S.D. Cal. March 18, 2011. "The fact that alleged harm is primarily in the form of lost customers and business goodwill, which at least in theory may be compensated by damages, weighs against [a] claim of irreparable harm." TMX Funding, Inc. v. Impero Techs., Inc., No. 10-0202 JF, 2010 WL 1028254, at *8 (N.D. Cal. March 18, 2010), citing Sampson v. Murray, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

Still, other cases have relied on such elements. In Stuhlberg Int'l Sales Co., Inc., 240 F.3d at 841, the Court stated that "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." Yet, that case involved an injunction that would allow the release of goods from customs to customers who had already ordered those goods, and without the injunction, would not receive goods they had ordered. Id. That is much more concrete than the rather speculative claims made here. Thus, the Court finds Ubisoft has not demonstrated a significant threat of irreparable injury.

### C.     Balance of Hardships

Ubisoft argues that OG assumed any harm when they chose to copy Ubisoft's protectable expression. It argues that the many competitors in the marketplace that do not use Ubisoft's intellectual property demonstrate OG could have easily avoided infringement by not incorporating Ubisoft's prominent visual features.

OG argues it would be disproportionately harmed by a preliminary injunction because it is a much smaller company and a relatively recent entrant into the U.S. video game market. Scott Decl. ¶ 6. OG states it will lose prospective significant sales and customers and the ability to gain a foothold in the market for instructional-based dance video games because if

15

it misses its set launch date it will miss the Christmas shopping season. OG argues an injunction will prevent it from releasing its highly-anticipated product at a critical time of the year, when consumer shopping will reach its peak. Scott Decl. ¶¶ 27-28. Missing the product launch date for its first big-name game could "deal a potentially fatal blow to OG's relationship with its U.S. customers, who are relying on the November 8th product release date." Opp'n at 23. Thus, it argues that while it is only speculative that Ubisoft might lose some sales or market share without an injunction, with an injunction OG will lose significant sales and revenue. Moreover, OG argues Ubisoft was or should have been aware of Get Up and Dance since the E3 convention in June 2011, and chose to wait till the eve of the game's release to move for injunctive relief. Thus, it argues the harm cannot be what it alleges, or it would have acted far sooner. Rather, OG argues the goal is to disrupt OG's ability to market its game during the rapidly approaching holiday season. Given the speculative nature of Ubisoft's alleged harms, the Court finds the balance does not sharply in Ubisoft's favor.

**D.     Public Interest**

Protecting copyrights and avoiding consumer confusion is in the public interest. Warner Bros. Entm't, Inc. v. WTV Sys., Inc., — F. Supp. 2d —, 2011 WL 4001121 (C.D. Cal. Aug. 1, 2011); Caesars World, Inc. v. Milanian, 247 F. Supp. 2d 1171, 1205 (D. Nev. 2003). Yet, this is when infringement has been established as likely. Here, the Court finds there is not a clear likelihood of success on these claims. In such a situation, public policy can favor competition, where a preliminary injunction could be very harmful to a small company and reduce the number of options for consumers. See SRI Int'l v. Acoustic Imaging Techs. Corp., No. 92-5015, 1993 WL 356896, at *4 (N.D. Cal. Sept. 3, 1993) ("[P]ublic interest is also served by promoting competition, free from judicial intervention that is improvident or warranted by only insubstantial grounds."). Thus, where Ubisoft has not shown a clear likelihood of success on the merits, nor a strong demonstration of irreparable harm and balance of the hardships, the Court determines an injunction would not be in the public interest.

//

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES the temporary restraining order and preliminary injunction.

**IT IS SO ORDERED.**

Dated: October 26, 2011

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE